## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JASON LEOPOLD,

                Plaintiff,

    v.

FEDERAL BUREAU OF
INVESTIGATION, *ET AL.,*

                Defendants.

Civil Action No. 22-cv-1921-BAH

## <u>DECLARATION OF SHANNON R. HAMMER</u>

I, Shannon R. Hammer, declare as follows:

1.      I am currently Assistant Section Chief (ASC) of the Record/Information

Dissemination Section (RIDS), Information Management Division (IMD), Federal Bureau of

Investigation (FBI), in Winchester, Virginia, and in the absence of RIDS Section Chief Michael

G. Seidel, I serve as Acting Section Chief for RIDS. I have held this position since January 2024.

I joined the FBI in October 2006, and prior to my current position, I was the Acting ASC of

RIDS; Unit Chief of the National Security and Classification Operations Unit; Unit Chief of a

FOIPA Operations Unit; and a supervisor in the Initial Processing Operations Unit. In those

capacities, I had management oversight for the RIDS national security review program;

enterprise declassification review compliance pursuant to Executive Order 13,526, and

classification reviews for civil and criminal discovery matters; and I oversaw the frontend

operations of the FBI's FOIPA program.

2.      In my official capacity as Assistant Section Chief of RIDS, I supervise

approximately 243 FBI employees, supported by approximately 106 contractors, who staff a total

of nine (9) Federal Bureau of Investigation Headquarters (FBIHQ) units and two (2) field

1

operational service center units whose collective mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the FOIA as amended by the OPEN Government Act of 2007, the OPEN FOIA Act of 2009, and the FOIA Improvement Act of 2016; the Privacy Act of 1974; Executive Order 13526; 75 Fed. Reg. 707 (Jan. 5, 2010; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. In the absence of Section Chief Michael G. Seidel, in my role as A/SC, my responsibilities include the review of FBI information for classification purposes as mandated by Executive Order 13,526, 75 Fed. Reg. 707 (Jan. 5, 2010), and the preparation of declarations in support of Exemption 1 claims asserted by the FBI under the FOIA. The Section Chief, RIDS, has been designated by the Attorney General of the United States as an original classification authority and a declassification authority pursuant to Executive Order 13526, §§ 1.3 and 3.1. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

3.      Because of the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information pursuant to the FOIA, 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a. Specifically, I am aware of the FBI's handling of Plaintiff's multi-category FOIA request that is the subject of this litigation.

4.      In response to Plaintiff's request, the FBI processed a total of 683 pages of responsive records subject to the FOIA. Of the 683 pages, 499 pages were released in full, 120 pages were released in part, 56 pages were withheld in their entirety and 8 pages were

determined to be duplicates of another page processed and released to Plaintiff.[1]

5.      In accordance with *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), the FBI

submits this declaration in support of Defendants' Motion for Summary Judgment. Part 1 of this

declaration provides the Court with a summary of the administrative history of Plaintiff's

request; Part II describes the procedures used to search for records subject to the FOIA; Part III

provides the justification for withholding certain information pursuant to FOIA Exemptions 1, 3,

5, 7(A) and 7(E), 5 U.S.C. §§ 552(b)(1), (b)(3), (b)(5), (b)(7)(A) and (b)(7)(E); Part IV provides

justification for the FBI's categorical withholding of information pursuant to FOIA Exemption

7(A); [2] and Part V provides justification for the FBI's 7(A) *Glomar*[3] provided to Plaintiff in

response to Item 6 of his FOIA request.

_____

[1] Plaintiff's counsel advised in an email dated December 8, 2023 that Plaintiff is challenging the FBI's search and its withholdings under Exemptions 1, 3, 5, (b)(7)(A), and (b)(7)(E). Counsel further advised Plaintiff is not challenging FOIA Exemptions (b)(6), (b)(7)(C), (b)(7)(D), or (b)(7)(F). The FBI identified fifty-one (51) documents containing challenged exemptions. Of this challenged set of documents, the FBI released in full 120 pages, released in part 111 pages, withheld in full pursuant to FOIA exemptions 56 pages, and withheld in full 8 pages as duplicate to other pages.

[2] In its Minute Order dated July 11, 2023, the Court granted the parties' Unopposed Motion to Bifurcate, permitting the Defendants to move for summary judgment as to the investigative file based on applicability of Exemption 7(A) only, while preserving any additional underlying exemptions that may apply. In the event Exemption 7(A) expires during the pendency of this FOIA litigation, or if the Court denies the FBI's motion for summary judgment based on its categorical application of Exemption 7(A), the FBI preserves the right to, and will, assert additional underlying FOIA Exemptions that may apply to the investigative file materials.

[3] The phrase "*Glomar*" stems from a case in which a FOIA requester sought information concerning a ship named the "*Hughes Glomar Explorer*," and the CIA refused to confirm or deny its relationship with the *Glomar* vessel because to do so would compromise the national security or divulge intelligence sources and methods. *Phillippi v. CIA*, 655 F.2d 1325, 1330-31 (D.C. Cir. 1981). *Glomar* responses are proper "if the fact of the existence or nonexistence of agency records falls within a FOIA exemption." *Wolf v. CIA,* 473 F.3d 370, 374 (D.C. Cir. 2007).

**PART I:  ADMINISTRATIVE HISTORY OF PLAINTIFF'S REQUEST
FBI FOIPA REQUEST NUMBER 1523733-000**

6.      By electronic FOIA (eFOIA)[4] dated February 22, 2022, Plaintiff submitted a

FOIA request to the FBI seeking the following records:

- All records, such as emails, memos, text messages, reports, mentioning or referring to Presidential Records removed from the Trump White House that were stored at Mar-a-Lago. For this part of the request please search the offices of the Director, Deputy Director, National Security Branch, Intelligence Branch, Criminal, Cyber, Response and Services Branch and Counterintelligence and Foreign Counterintelligence offices.

- All records, such as emails, memos, text messages, letters, reports, personnel in the offices listed in part 1 exchanged with the National Archives, Department of Justice, CIA, Defense Intelligence Agency, NSA, DOD and the State Department mentioning or referring to boxes of Presidential Records removed from the Trump White House that were stored at Mar-a-Lago; classified information and boxes of Presidential Records from the Trump White House that were stored at Mar-a-Lago. Please search the same offices listed in part 1 for responsive records.

- Any and all damage assessments, specifically reports documenting damage to national security or the potential damage to national security, that resulted from the removal of presidential records from the Trump White House and the storage of those Presidential Records at Mar-a-Lago.

- All cross reference files from the CRS that mention or refers to boxes of Presidential Records removed from the Trump White House that were stored at Mar-a-Lago.

- All 302s, FD-204, FD-192, forms mentioning or referring to the National Archives and boxes of Presidential Records removed from the Trump White House that were stored at Mar-a-Lago and classified information.

- All records, such as emails, letters, memos, text messages reports, mentioning or referring to Presidential Records from the Trump White House that were destroyed and Presidential Records from the Trump White House that were allegedly flushed down the toilet. Please search the same offices listed in part 1 for responsive records.

7.      Further, Plaintiff requested that the FBI conduct a search for all investigative and

---

[4] An eFOIA is an electronic means by which requesters can submit FOIA requests to the FBI online, through the FBI's public website, www.FBI.gov.

non-investigative records responsive to his request and that the searches include an ECF, TEXT, CRS and ELSUR search. In addition, Plaintiff requested a waiver of all fees associated with the processing of his request. Plaintiff further advised that if his fee waiver was denied, he would be willing to pay additional fees up to $25.00. **(Ex. A.)**

8.      By letter dated March 8, 2022, the FBI acknowledged receipt of Plaintiff's FOIA request, and notified Plaintiff that it had assigned FOIPA Request Number 1523733-000 to the request. The FBI also informed Plaintiff of the following:  Plaintiff submitted his request via the FBI's eFOIA system, the FBI determined it was compliant with the eFOIA terms of service, and future correspondence about the request would be provided electronically; Plaintiff's public interest fee waiver was under consideration, and Plaintiff would be advised of the decision at a later date, and if Plaintiff's fee waiver was not granted, Plaintiff would be responsible for applicable fees; and for the purpose of assessing any fees, the FBI determined as an educational institution, noncommercial scientific institution or representative of the news media requester, Plaintiff would be charged applicable duplication fees in accordance with 5 U.S.C. § 552(a)(4)(A)(ii)(II). Additionally, the FBI informed Plaintiff he could check the status of his request and/or contact the FBI with any questions at www.fbi.gov/foia. Furthermore, Plaintiff could appeal the FBI's response to the Department of Justice (DOJ), Office of Information Policy (OIP) within ninety (90) days of the date of its letter, contact the FBI's public liaison, and or seek dispute resolution services by contacting the Office of Government Information Services (OGIS). **(Ex. B.)**

9.      By letter dated March 11, 2022 and transmitted to Plaintiff via the FBI's eFOIA portal, the FBI informed Plaintiff it could neither confirm nor deny the existence of records responsive to Plaintiff's request pursuant to FOIA Exemptions (b)(7)(A) and (b)(7)(E) (5

U.S.C. § 552(b)(7)(A) and (b)(7)(E)). At the time of this response, the FBI had not publicly

acknowledged the existence of an investigation at Mar-a-Lago. The FBI advised that as a federal

law enforcement agency, a confirmation by the FBI that it has or does not have responsive

records would be tantamount to acknowledging the existence or nonexistence of a pending

investigation it had not previously acknowledged. Therefore, the FBI could neither confirm nor

deny the existence of records pursuant to FOIA Exemption (b)(7)(A) of 5 U.S.C. § 552. In

addition, FOIA Exemption (b)(7)(E) protects "records or information compiled for law

enforcement purposes when disclosure would disclose techniques and procedures for law

enforcement investigations or prosecutions or would disclose guidelines for law enforcement

investigations or prosecutions if such disclosure would reasonably be expected to risk

circumvention of the law."  How the FBI applies its investigative resources against a particular

allegation, report of criminal activity, or perceived threat is, itself a law enforcement technique

or procedure that the FBI protects pursuant to Exemption (b)(7)(E) of 5 U.S.C. § 552.

Accordingly, a confirmation by the FBI that it has or does not have responsive records would be

tantamount to acknowledging where the FBI is or is not applying investigative resources, thus

disclosing the scope of the law enforcement techniques and procedures. For that reason, the FBI

stated that it could neither confirm nor deny the existence of records pursuant to FOIA

Exemption (b)(7)(E). Finally, the FBI informed Plaintiff his request was being closed, that he

could appeal the FBI's response to OIP within ninety (90) days of its letter, contact the FBI's

public liaison, and/or seek dispute resolution services by contacting OGIS. **(Ex. C.)**

10.     By email dated March 11, 2022, Plaintiff submitted an appeal to OIP via DOJ's

online portal, challenging the FBI's March 11, 2022 *Glomar* response denying his request under

FOIA Exemptions (b)(7)(A) and (b)(7)(E). **(Ex. D.)**

11.    By letter dated March 11, 2022, OIP acknowledged receipt of Plaintiff's appeal and informed Plaintiff that OIP assigned appeal number A-2022-00932 to his appeal. **(Ex. E.)**

12.    On July 1, 2022, Plaintiff filed the Complaint in the instant action. (ECF No. 1.)

13.    By letter dated October 31, 2022, OIP informed Plaintiff it was aware the FBI FOIPA Request 1523733-000 associated with appeal AP-2022-00932 was now part of a lawsuit in the United States District Court for the District of Columbia. OIP advised that per Department of Justice regulations located at 28 C.F.R. § 16.8(b)(2) (2021), an appeal will ordinarily not be acted upon by OIP if the FOIA request becomes the subject of litigation. OIP advised Plaintiff, for that reason, his request would not be acted upon, and his appeal was being closed. **(Ex. F.)**

14.    By letter dated November 22, 2022, transmitted to Plaintiff's counsel via email by the Federal Programs Attorney, the FBI informed Plaintiff that his FOIPA Request was reopened under Civil Action No. 1:22-cv-01921, that Items 1 through 5 of his February 22, 2022 request would be addressed as the FBI was searching, gathering, and processing material so that it could be reviewed for responsiveness to his request, and that as to Item 6 of his request, because FBI is a federal law enforcement agency, a confirmation by the FBI that it has or does not have responsive records would be tantamount to acknowledging the existence or nonexistence of a pending investigation it had not previously acknowledged. Therefore, the FBI could neither confirm nor deny the existence of records pursuant to FOIA Exemption (b)(7)(A) of 5 U.S.C. § 552. Finally, the FBI informed Plaintiff he could appeal the FBI's response to OIP within ninety (90) days of its letter, contact the FBI's public liaison, and/or seek dispute resolution services by contacting OGIS. **(Ex. G.)**

15.    By letter dated May 23, 2023, the FBI made its first interim release of records

responsive to Plaintiff's request, advising it reviewed 501 pages and released 224 pages in full or in part, with certain information withheld pursuant to FOIA Exemptions (b)(6), (b)(7)(C), and (b)(7)(E). The FBI advised that documents were located which originated with, or contained information concerning, another government agency (OGA). The FBI further advised that it sent those documents to the OGA for consultation and would correspond with Plaintiff upon completion of the consultation. Additionally, Plaintiff was advised that: (i) the records are Bates-numbered FBI 22-cv-1921-1 through FBI 22-cv-1921-501; and (ii) duplicate copies of the same document were not processed. Finally, the FBI advised Plaintiff he could appeal the FBI's response to OIP within ninety (90) days of its letter, contact the FBI's public liaison, and/or seek dispute resolution services by contacting OGIS. (**Ex. H**.)

16.     By letter dated July 7, 2023, the FBI made its second interim release of records to Plaintiff. The FBI advised Plaintiff it reviewed 182 pages and released 23 pages in full or in part, with certain information withheld pursuant to FOIA Exemptions (b)(1), (b)(3), (b)(5), (b)6), (b)(7)(A), (b)(7)(C), (b)(7)(E), and (b)(7)(F). The FBI advised that documents were located which originated with, or contained information concerning, another government agency (OGA). The FBI further advised that it sent those documents to the OGA for consultation and would correspond with Plaintiff upon completion of the consultation. Additionally, Plaintiff was advised that: (i) the records are Bates-numbered FBI 22-cv-1921-502 through FBI 22-cv-1921-683; and (ii) duplicate copies of the same document were not processed. Finally, the FBI advised Plaintiff he could appeal the FBI's response to OIP within ninety (90) days of its letter, contact the FBI's public liaison, and/or seek dispute resolution services by contacting OGIS. (**Ex. I**.)

17.     By letter dated July 25, 2023, the FBI advised Plaintiff it would continue to consult with OGAs and would issue additional monthly releases as the consultations were

completed. Further, the FBI advised Plaintiff he could appeal the FBI's response to OIP within ninety (90) days of its letter, contact the FBI's public liaison, and/or seek dispute resolution services by contacting OGIS. (**Ex. J**.)

18.    By letter dated August 25, 2023, the FBI advised Plaintiff it would continue to consult with OGAs and would issue additional monthly releases as the consultations were completed. Further, the FBI advised Plaintiff he could appeal the FBI's response to OIP within ninety (90) days of its letter, contact the FBI's public liaison, and/or seek dispute resolution services by contacting OGIS. (**Ex. K**.)

19.    By letter dated September 25, 2023, the FBI advised Plaintiff it would continue to consult with OGAs and would issue additional monthly releases as the consultations were completed. Further, the FBI advised Plaintiff he could appeal the FBI's response to OIP within ninety (90) days of its letter, contact the FBI's public liaison, and/or seek dispute resolution services by contacting OGIS. (**Ex. L**.)

20.    By letter dated October 26, 2023, the FBI made its third interim release of records to Plaintiff. The FBI advised Plaintiff it reviewed 267 pages and released 267 pages in their entirety. The FBI further advised Plaintiff he could appeal the FBI's response to OIP within ninety (90) days of its letter, contact the FBI's public liaison, and/or seek dispute resolution services by contacting OGIS. (**Ex. M**.)[5]

21.    By letter dated November 30, 2023, the FBI made its fourth and final interim

---

[5] Although not identified in the October 26, 2023 letter, the records were Bates-Numbered FBI 22-cv-1921-25 through FBI 22-cv-1921-46, FBI 22-cv-1921-112 through FBI 22-cv-1921-180, FBI 22-cv-1921-184 through FBI 22-cv-1921-227, FBI 22-cv-1921-301 through FBI 22-cv-1921-223, FBI 22-cv-1921-332 through FBI 22-cv-1921-350, FBI 22-cv-1921-388 through FBI 22-cv-1921-433, FBI 22-cv-1921-435 through FBI 22-cv-1921-458, and FBI 22-cv-1921-482 through FBI 22-cv-1921-501.

release of records to Plaintiff. The FBI advised Plaintiff it reviewed 150 pages and released 105

pages in full or in part, with certain information withheld pursuant to FOIA Exemptions (b)(1),

(b)(3), (b)(5), (b)6), (b)(7)(A), (b)(7)(C), (b)(7)(D), (b)(7)(E), and (b)(7)(F). The FBI advised

redactions were made by DOJ, OIP and DOJ, National Security Division (NSD). Additionally,

Plaintiff was advised that the records are Bates-numbered FBI 22-cv-1921-324 through FBI 22-

cv-1921-331, FBI 22-cv-1921-434, FBI 22-cv-1921-589, FBI 22-cv-1921-502 through FBI 22-

cv-1921-528, FBI 22-cv-1921-550 through FBI 22-cv-1921-618, FBI 22-cv-1921-626 through

FBI 22-cv-1921-369, and FBI 22-cv-1921-644 through FBI 22-cv-1921-673. Finally, the FBI

advised Plaintiff he could appeal the FBI's response to OIP within ninety (90) days of its letter,

contact the FBI's public liaison, and/or seek dispute resolution services by contacting OGIS. (**Ex.

N.**)

      22.     While making the releases described in paragraphs 15-16 and 20-21 *supra*, FBI

categorically withheld all responsive records in its investigative file.

      23.     In response to an April 29, 2024 request emailed by Plaintiff, FBI agreed to

conduct an additional review of the information contained within the processed responsive

records located outside the investigative file and compare it to the information contained in ECF

470-4 Exhibit D (FBI FD-302 interview form) filed in 9:23-cr-80101-AMC, *USA v. Trump, et

al.*, provided to the FBI by Plaintiff, to determine whether any information previously withheld

had since been officially acknowledged and could be segregated for release to Plaintiff. That

review was conducted and the FBI determined that no previously redacted or withheld

information had been officially acknowledged, and thus, no reprocessing of the records was

warranted.

**PART II:  THE FBI'S SEARCH METHODOLOGY**

      24.     Plaintiff's request seeks copies of various investigative and non-investigative

records referring, mentioning and/or relating to the FBI's ongoing criminal investigation, which concerns records taken by ex-President Donald Trump to his residence in Mar-a-Lago, Florida.

25.    Plaintiff specifically requested that in searching for responsive records, the FBI search two offices with no direct investigative role (if any) in the investigation (the offices of the Director and Deputy Director) and several other offices with a direct investigative role (if any) in the same (the remaining offices referred to).

26.    Given the comprehensive nature of the information contained therein, (*see* ¶ 28, *infra*), which stems principally from FBI's policy obligating personnel to store information in it, (*see* ¶ 29, *infra*), the CRS is the FBI recordkeeping system where investigative and non-investigative materials related to an ongoing criminal investigation would reasonably be expected to be found. Thus, in this case, the FBI determined that the CRS is where records responsive to Plaintiff's request would reasonably be expected to be found.

27.    The FBI also determined that Plaintiff's request for non-investigative email communications to and from the Director and Deputy Director might not reasonably be found in the CRS, because of the potential non-investigative role played in the Mar-a-Lago investigation by those two individuals.

THE FBI'S CENTRAL RECORDS SYSTEM

28.    The CRS is an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI while fulfilling its mission and integrated functions as a law enforcement and intelligence agency, and in the fulfillment of its administrative and personnel functions. The CRS spans the entire FBI organization and encompasses the records of FBI Headquarters (FBIHQ), FBI field offices, and FBI legal attaché offices (legats) worldwide.

29.    The FBI's Records Management Policy mandates that FBI personnel enter all

federal records into an authorized FBI recordkeeping system; here, the CRS. FBI personnel are responsible for managing records they create and receive, determining the record status for each potential record, and importing records. *See* FBI Records and Information Management Policy Guide, 1223PG (September 22, 2022) at pp. 11-12 and 25-28 (Sections 2.9 and 4.2.3) available at https://vault.fbi.gov/records-and-information-management-policy-guide-1223pg/records-and-information-management-policy-guide-1223pg/view (last accessed on August 20, 2024). The functional offices Plaintiff identified in his request—namely, the National Security Branch, Intelligence Branch, Criminal, Cyber, Response, and Services Branch, and Counterintelligence and Foreign Counterintelligence offices—were obligated by the Records Management Policy to enter their records, including those that would be responsive to Plaintiff's request, into the CRS.

30.     The illustrative categories of records identified by Plaintiff in his request, namely "emails," "memos," "text messages," "reports," "damage assessments," and "302[], FD-204, [and] FD-192" reports, would fall under the FBI's Records Management Policy if they meet the other criteria governing the definition of a "record."  Accordingly, a search of the CRS's records would be reasonably expected to reveal these categories of records.

31.     The CRS consists of a numerical sequence of files, called FBI "classifications," which are organized according to designated subjects. The broad array of CRS file classification categories include types of criminal conduct and investigations conducted by the FBI, as well as categorical subjects pertaining to counterterrorism, intelligence, counterintelligence, personnel, and administrative matters. For identification and retrieval purposes across the FBI, when a case file is opened, it is assigned a Universal Case File Number (UCFN) consisting of three sequential components: (a) the CRS file classification number, (b) the abbreviation of the FBI Office of Origin (OO) opening the file, and (c) the assigned individual case file number for the particular

subject matter.[6] Within each case file, pertinent documents of interest are "serialized," or assigned a number in the order which the document is added to the file, typically in chronological order.

*The Central Records System's General Indices and Indexing*

32.     The general indices to the CRS, comparable to a digital version of a library card catalog, function as the key to locating records within the enormous amount of information contained in the CRS. FBI personnel index information in the CRS by individual (person), organizations (entity, place, or thing), or activity or event (e.g., terrorist attack or bank robbery) when information is deemed sufficiently significant to warrant indexing for future retrieval. The entries in the general indices fall into two categories:

        A. <u>Main entry</u>. A main index entry is created for each individual or non-individual (e.g., organization, event, or activity) that is the subject or focus of an investigation. Main subjects are identified in the case title of a file.

        B. <u>Reference entry</u>. A reference index entry is created for each individual or non-individual (e.g., organization, event, or activity) associated with an investigation, but who or which is not the main subject or focus of the investigation. Reference subjects are typically not identified in the case title of a file.

*Sentinel*

33.     FBI personnel access the general indices to the CRS through Sentinel, the FBI's case management system (since July 1, 2012). Prior to Sentinel, the FBI relied on a case

---

[6] For example, in fictitious file number "11Z-HQ-56789," "11Z" indicates the file classification, "HQ" indicates that FBI Headquarters is the FBI OO, and "56789" indicates the assigned case specific file number.

management system known as Automated Case Support (ACS).[7]  On August 1, 2018, the FBI

decommissioned ACS and the ACS indices were migrated into Sentinel, where they are

accessible and searchable through Sentinel's indices search function. In addition to providing

access to the ACS indices, Sentinel provides a means for FBI personnel to access the FBI's older

manual indices, when necessary.

34.    FBI personnel rely on Sentinel to locate records and other types of documents to

fulfill essential functions, such as conducting criminal, counterterrorism, and national security

investigations; conducting background investigations; performing citizenship and employment

queries; and administering security screenings, to include presidential protection. Sentinel's

index search methodology and function allows FBI personnel to query the CRS for indexed

subjects in case files.

35.    However, the identification of records indexed to the subject of a FOIPA request

does not automatically mean the indexed records are responsive. Index searches using the search

functions available in Sentinel are the means by which potentially responsive records are located,

but ultimately, a FOIPA analyst must review potentially responsive records against the specific

parameters of individual requests. Responsiveness determinations are made once indexed records

are gathered, analyzed, and sorted by FOIPA analysts who then make informed scoping

decisions to determine the total pool of records responsive to an individual request. This

procedure was followed in response to this FOIA request.

*Targeted Search and Sentinel Search*

36.    At the time Plaintiff's request was received, the FBI had already received and was

---

[7] As part of the ACS implementation process, over 105 million pre-existing CRS records were
converted from automated systems previously utilized by the FBI into a single, consolidated case
management systems accessible by all FBI offices.

working on other FOIA requests seeking records maintained in the FBI's investigation

concerning records seized from former President Donald Trump's Mar-a-Lago residence. FBI

RIDS personnel contacted the FBI's Washington Field Office (WFO) and consulted with

personnel familiar with the investigation. The FBI also conducted a keyword search for main

entries[8] in its Sentinel indices via Sentinel's search function using the following terms: "Donald

Trump," "Mar-a-lago," and "Maralago," employing a search cut-off date of October 5, 2022

which is the date of the FBI's initial search for records[9] and located the FBI's investigative file in

Sentinel. The presence of any one of these terms in a record would result in that record being

identified as potentially responsive.

37.     The only responsive records located as a result of the FBI's CRS search were

those located in its Mar-a-Lago investigative file.

*FBI'S SEARCH FOR RESPONSIVE EMAIL RECORDS*

38.     In addition to its CRS index search efforts, the FBI determined some of the

records Plaintiff requested were not reasonably likely to be indexed in the CRS. This is because

Plaintiff specifically requested the FBI search the offices of the Director and Deputy Director for

"All records, such as emails…mentioning or referring to Presidential Records removed from the

Trump White House that were stored at Mar-a-Lago."

*The Nature of FBI Email Records*

39.     FBI email communications are stored within the separate email accounts of FBI

---

[8] *See* ¶ 32, *infra*, for an explanation of main entries.

[9] A search cut-off date is the date that the agency commences a search for records responsive to a
FOIPA request. Generally, the FBI uses a search cut-off date to delineate the scope of a FOIPA
request by treating records created after that date as not responsive to the request. See 28 C.F.R.
§ 16.4(a). The Department of Justice (DOJ) provides notice of the use of a search cut-off date in
its published FOIA reference guide on its FOIA website (https://www.justice.gov/oip/doj-guide-
freedom-information-act-0) (last accessed July 5, 2023).

employees. These accounts include all emails sent to or from the specific employees. Typically, FBI employees have two email accounts – one unclassified email account (UNet) capable of communicating internally, with other government agencies (OGAs), with other branches of the United States Government, and with the public/non-governmental entities; and one classified account (FBINet) to communicate up to the "SECRET" classification level, able to communicate internally, with OGAs, and with other branches of the United States Government. Due to this structure, the FBI must first identify likely custodians of responsive records, and whether communications are likely to be stored within their unclassified and/or classified accounts.

40.    Once likely custodians and the appropriate accounts (classified or unclassified) are identified, the FBI must then develop appropriate search terms to search within individual accounts. Since there is no index within FBI employees' email accounts, terms must be designed to efficiently search all text of emails within employees' accounts. The terms allow the FBI to conduct email searches for responsive records with a reasonable amount of effort and a reasonable likelihood of locating responsive records.

*Email Search Execution*

41.    For the reasons described in ¶ 38, *supra*, FBI executed a search of the email accounts of the Director and Deputy Director.

42.    To locate email records responsive to Plaintiff's request, the FBI searched the unclassified and classified email accounts of Director Christopher Wray and Deputy Director Paul Abbate for email records created or received between February 1, 2022 and October 5, 2022.

43.    Since there is no index within FBI employees' email accounts, terms must be

designed to efficiently search all text of emails within those accounts.

44.    Within these accounts, the FBI searched the following terms. The presence of any one of these terms would result in that record being identified as potentially responsive.

  a.  "Trump"

  b.  "Mar-a-lago"

  c.  "Presidential Records"

  d.  "White House"

45.    All the non-investigative records—that is, all of the records individually processed, redacted, and/or released to Plaintiff in this instant action—were located through the FBI's search of the email accounts of the Director and Deputy Director.

### MANUAL POST-SEARCH PROCESSING

46.    After identifying potentially responsive records through the above-described searches of the CRS and FBI's email system, the FBI manually refined the universe of records to include only those responsive to Plaintiff's request.

### ADEQUACY OF THE FBI'S SEARCHES

47.    The FBI's CRS search and its email searches of the accounts of the named custodians, using the terms listed above, were reasonably calculated to locate all records responsive to Plaintiff's requests. Furthermore, the FBI found no lead that additional responsive records could be located through additional searches.

48.    Plaintiff has provided no information for the FBI to reasonably conclude that records responsive under the FOIA would reside in any other location and there is no indication from the FBI's search efforts that responsive records would reside in any other FBI location. Thus, the FBI has searched all locations and files reasonably likely to contain responsive records, and there is no basis for the FBI to conclude that a search elsewhere would reasonably be likely

to locate responsive records under the FOIA.

### III. JUSTIFICATION FOR NONDISCLOSURE UNDER THE FOIA

*GENERAL INFORMATION*

49.      The FBI processed all responsive records derived from its search of emails to achieve maximum disclosure consistent with the access provisions of the FOIA. Every effort was made to provide Plaintiff with all non-exempt material and, where some material was exempt, with all reasonably segregable, non-exempt information in proximity to the exempt material. The FBI did not withhold any reasonably segregable, non-exempt portions from Plaintiff. Further description of the information withheld, beyond what is provided in this declaration, could identify the actual exempt information.

50.      *Bates Numbering & Index*:  The FBI numbered all pages of its production of records located outside of the pending investigative file consecutively as "FBI 22-cv-1921-1" through "FBI 22-cv-1921-683". On the pages released in full or in part, these numbers are typically located at the bottom of each page. Additionally, included as an exhibit to this declaration is an index that identifies the pages that the FBI released in part and withheld in full and its justification for doing so.[10] **(Ex. O.)**  The index also indicates the specific FOIA exemptions asserted on each page released in part.

51.      *Justification Codes*:  On the Bates-numbered pages provided to Plaintiff and on pages withheld in full and accounted for in the FBI's index, the FBI further categorized its application of exemptions to better explain the nature of the information withheld pursuant to the

---

[10] The FBI withheld and redacted information pursuant to FOIA Exemptions that Plaintiff has elected not to challenge. Where those withholdings and redactions occur on pages that are part of documents containing withholdings or redactions under FOIA Exemptions that Plaintiff did elect to challenge, the unchallenged redactions and withholdings may appear in this index.

provisions of the FOIA. Specifically, the FBI applied numerical codes that coincide with various categories of exempt information.[11] The declaration and index demonstrate that all information withheld by the FBI is exempt from disclosure pursuant to the cited FOIA exemptions or is so intertwined with non-exempt information that segregation is not possible without revealing the underlying exempt information.

52.    Each instance of information withheld pursuant to a FOIA exemption is accompanied by a coded designation that corresponds to the categories listed below. For example, if "(b)(5)-1" appears on a document, the "(b)(5)" designation refers to FOIA Exemption 5 protecting privileged information. The numerical designation of "1" following the "(b)(5)" narrows the main category into a more specific subcategory, such as "Deliberative Process Privilege."

53.    Below is a summary of the challenged FOIA exemptions asserted to withhold portions of information in Bates-numbered pages FBI 22-cv-1921-1 through FBI 22-cv-1921-683.[12]

| SUMMARY OF EXEMPTION JUSTIFICATION CATEGORIES | |
|---|---|
| **CODED CATEGORIES** | **INFORMATION WITHHELD** |
| **Exemption 1** | **Information Classified Per Executive Order 13526** |
| (b)(1)-1 | Information Properly Classified By an FBI Official Pursuant to Executive Order (E.O.) 13,526 |
| **Exemption 3** | **Information Protected by Statute** |
| (b)(3)-1 | Federal Rules of Criminal Procedure, Rule 6(e) |

[11] As of July 2022, the FBI implemented standard codes for justification categories. Not all codes are applicable in each FOIA litigation; therefore, the codes may not be sequential if not relevant to the records at issue.

[12] As previously stated in Footnote 1 *supra,* Plaintiff is only challenging information withheld pursuant to FOIA Exemptions 1, 3, 5, (b)(7)(A) and (b)(7)(E) within the records processed and produced to him that were located outside of the FBI's pending investigative file.

| (b)(3)-5 | National Security Act of 1947 [50 U.S.C. Section 3024(i)(1)] |
|---|---|
| **Exemption 5** | **Privileged Information** |
| (b)(5)-1 | Deliberative Process Privilege |
| (b)(5)-2 | Attorney Client Privilege |
| (b)(5)-3 | Attorney Work Product |
| **Exemption 7(A)** | **Pending Law Enforcement Proceedings** |
| (b)(7)(A)-1 | Information Which, if Disclosed, Could Reasonably be Expected to Interfere with Pending Enforcement Proceedings |
| **Exemption 7(E)** | **Investigative Techniques and Procedures** |
| (b)(7)(E)-2 | Identity of an FBI Division |
| (b)(7)(E)-3 | Internal FBI Telephone Numbers, Room Numbers, Email Addresses and Internet/Web Addresses |
| (b)(7)(E)-4 | Collection and Analysis of Information |
| (b)(7)(E)-5 | Investigative Focus of Specific Investigations |
| (b)(7)(E)-6 | Types and Timing of Investigations |

### EXEMPTION 1: CLASSIFIED INFORMATION

54.    The FBI's analysis for withholding classified information contained in the records at issue is based on the standards articulated in the FOIA statute, 5 U.S.C. § 552(b)(1). Exemption 1 protects from disclosure those records that are:

    a.  specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy; and

    b.  are in fact properly classified pursuant to such Executive Order.

55.    Before I consider an Exemption (b)(1) claim for withholding agency records, I determine whether the information in those records satisfies the requirements of Executive Order (E.O.) 13,526, the executive order governing the classification and protection of information that affects the national security, and whether the information complies with the various substantive and procedural criteria of that order. Executive Order 13,526, signed by President Barack Obama on December 29, 2009, is the order that currently applies to the protection of national security information. I am bound by the requirements of E.O. 13,526 when making classification

determinations.

56.    For information to be properly classified, and thus properly withheld from

disclosure pursuant to Exemption (b)(1), the information must meet the requirements set forth in

E.O. 13,526 § 1.1 (a):

1. an original classification authority is classifying the information;

2. the information is owned by, produced by or for, or is under the control of the
United States Government;

3. the information falls within one or more of the categories of information listed in
§ 1.4 of [the] order; and

4. the original classification authority determines that the unauthorized disclosure of
the information reasonably could be expected to result in damage to the national
security, which includes defense against transnational terrorism, and the original
classification authority is able to identify or describe the damage.

57.    As I will explain in further detail below, in my role as an original classification

authority, I have determined that the information withheld pursuant to Exemption (b)(1) is under

the control of the United States Government, is classified, and requires a classification marking

at the "Secret" level since the unauthorized disclosure of this information reasonably could be

expected to cause serious damage to national security. *See* E.O. 13,526 § 1.2(a)(2). In addition to

these substantive requirements, certain procedural and administrative requirements of E.O.

13,526 must be followed before information can be considered properly classified, such as,

proper identification and marking of documents. In particular, I made certain that all procedural

requirements of E.O. 13,526 were followed:

1. each document was marked as required and stamped with the proper classification
designation;

2. each document was marked to indicate clearly which portions are classified,
which portions are exempt from declassification as set forth in E.O 13526 §
1.5(b);

3.  the prohibitions and limitations on classification specified in E.O. 13526 § 1.7 were adhered to;

4.  the declassification policies set forth in E.O. 13526 §§ 3.1 and 3.3 were followed; and

5.  any reasonably segregable portions of the classified documents that did not meet the standards for classification under E.O. 13526 were declassified and marked for release, unless withholding was otherwise warranted under applicable law.

*Findings of the Declarant Regarding Exemption 1*

58.    Pursuant to Exemption 1, the FBI withheld information on three pages of draft talking points prepared for FBI Deputy Director Paul Abbate by the FBI's Office of Congressional Affairs.[13]

59.    With the above requirements in mind, I personally and independently examined the FBI information withheld pursuant to Exemption (b)(1). I determined all of the substantive, procedural, and administrative requirements set forth above have been satisfied. As a result, I concluded that the information protected pursuant to Exemption (b)(1) was properly classified, continues to warrant classification at the "Secret" level, and is exempt from disclosure pursuant to E.O. 13,526 § 1.4(c) - "intelligence activities (including covert action), intelligence sources or methods, or cryptology."

E.O. 13,526 § 1.4(c) – Intelligence Activities, Sources and Methods

60.    E.O. 13,526 § 1.4(c), exempts intelligence activities (including covert action), intelligence sources and methods, and cryptology from disclosure. An intelligence activity or method includes any intelligence action or technique utilized by the FBI against a targeted individual or organization that has been determined to be of national security interest. An intelligence method is used to indicate any procedure (human or non-human) utilized to obtain

---

[13] Bates numbers FBI 22-cv-1921-676-678.

information concerning such individual or organization. An intelligence activity or method has two characteristics. First, the intelligence activity or method -- and information generated by it -- is needed by U. S. intelligence/counterintelligence agencies to carry out their respective missions. Second, confidentiality must be maintained with respect to the activity or method if the viability, productivity, and usefulness are to be preserved.

61.    In the records at issue, the FBI withheld information pursuant to Exemption 1 to protect intelligence activities and methods utilized by the FBI to gather intelligence. This information is classified because its release would disclose the intelligence gathering capabilities of the activities and methods directed at specific targets. The information obtained from the intelligence activities and methods within the records at issue is very specific in nature, provided during a specific time period, and known to very few individuals.

62.    It is my determination that disclosure of specific information describing the intelligence activities and methods within the records at issue, which are still used by the FBI to gather intelligence information in other investigations, could reasonably be expected to cause serious damage to the national security for the following reasons: (1) disclosure would allow hostile entities to discover the current intelligence gathering activities and methods used by the FBI and (2) disclosure would reveal the criteria used and priorities assigned to current intelligence or counterintelligence investigations. With the aid of this detailed information, hostile entities could develop countermeasures which would, in turn, seriously disrupt the FBI's intelligence gathering capabilities. This serious disruption would also result in serious damage to the FBI's efforts to detect and apprehend those who violate the criminal laws of the United States and harm its national security interests.

63.    The FBI protected the following category of information specific to intelligence

activities and methods because disclosure reasonably could be expected to cause serious damage to the national security of the United States.

Detailed Intelligence Activities

64.    The FBI withheld classified information concerning detailed intelligence activity information gathered or compiled by the FBI on a specific individual or organization of national security interest. The disclosure of this information could reasonably be expected to cause serious damage to the national security as it would: (a) reveal the actual intelligence activity or method utilized by the FBI against a specific target; (b) disclose the intelligence-gathering capabilities of the activity; and (c) provide an assessment of the intelligence source penetration of a specific target during a specific period of time. This information is properly classified at the "Secret" level pursuant to E.O. 13,526 § 1.4(c) and is exempt from disclosure pursuant to FOIA Exemption 1.

*EXEMPTION 3: INFORMATION PROTECTED BY STATUTE*

65.    FOIA Exemption 3 exempts from disclosure information "specifically exempted from disclosure by statute . . . if that statute (A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (A)(ii) establishes particular criteria from withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552 (b)(3). The OPEN FOIA Act of 2009 established an additional requirement that any statute "enacted after the date of enactment of the OPEN FOIA Act of 2009, [must] specifically cite[] to this paragraph" in order to qualify for withholding under Exemption 3.

*(b)(3)-1: Federal Grand Jury Information – Federal Rule of Criminal Procedure 6(e)*

66.    The FBI asserted Exemption (b)(3) to protect Federal Grand Jury (FGJ)

information pursuant to Federal Rule of Criminal Procedure 6(e).[14] As relevant to 5 U.S.C.

§ 552(b)(3)(B), Rule 6(e) is a statute enacted before the date of enactment of the OPEN FOIA

Act of 2009.[15] It is well established Rule 6(e) embodies a broad, sweeping policy of preserving

the secrecy of grand jury material regardless of the substance in which the material is contained.

Portions of records responsive to Plaintiff's request contain information clearly identified as

being related to a federal grand jury matter.

67.     The first responsive record containing redacted grand jury information is the draft

affidavit in support of a search warrant application.[16]  The grand jury material appears amid a

discussion of the government's discussion of probable cause.  The redacted information would

reveal the identity (through one or more pseudonyms) of grand jury witnesses, and the content of

their testimony.

68.     The second record in which grand jury material was redacted is the draft redaction

proposal.[17]  In the section where redacted material appears, the draft explains to the court why to

reveal the material it sought to redact (in the affidavit) would allow a reader to assemble a road

---

[14] As prescribed by 18 U.S.C. § 3771 (subsequently repealed by Pub. L. No. 100-702, Title IV, § 404(a)(1) (Nov. 19, 1988) and replaced by 28 U.S.C. § 2074), proposed rules become effective ninety days after the Chief Justice reports them to Congress. By order of April 26, 1976, the Supreme Court adopted amendments to the Federal Rules of Criminal Procedure which included Rule 6(e) and reported the amendments to Congress. Congress voted to delay the effective date of several of the proposed rules, to include Rule 6(e), "until August 1, 1977, or until and to the extent approved by Act of Congress, whichever is earlier." Pub. L. No. 94-349 § 1, 90 Stat. 822 (1976). Subsequently, Congress, by statute, enacted a modified version of Rule 6(e). *See* Pub. L. No. 95-78, § 2(a), 91 Stat. 319 (1977), FED. R. CRIM. P. 6(e).

[15] The OPEN FOIA Act of 2009 was enacted October 28, 2009. *See* Pub. L. No. 111-83, 123 Stat. 2142, 2184.

[16] Specifically, the pages Bates numbered FBI 22-cv-1921-512, FBI 22-cv-1921-514-515, FBI 22-cv-1921-517, and FBI 22-cv-1921-521-523 contain redactions for grand jury material.

[17] The redacted material appears on the pages Bates numbered FBI 22-cv-1921-633-636 and FBI 22-cv-1921-638.

map to the government's investigation.  To reveal the same information here that the government sought to redact in the affidavit would allow the reconstruction of the same road map referred to there.

69.    Disclosure of this information would clearly violate the secrecy of the grand jury proceedings and could reveal the inner workings of a federal grand jury, which the FBI is precluded by law from disclosing. This is because the information relates to the information and evidence requested, collected, and reviewed by a federal grand jury in the scope of its investigation. Thus, the FBI properly withheld this information pursuant to Exemption (b)(3), in conjunction with Rule 6(e).

*(b)(3)-5:  National Security Act of 1947, 50 U.S.C. § 3024(i)(1)*

70.    The FBI asserted Exemption 3 to withhold information pursuant to Section 102A(i)(1) of the National Security Act of 1947 (NSA), as amended by the Intelligence Reform and Terrorism Prevention Act of 2004 (IRTPA). This statute provides that the Director of National Intelligence (DNI) "shall protect, and shall establish and enforce policies to protect, intelligence sources and methods from unauthorized disclosure."[18] As relevant to 5 U.S.C. § 552(b)(3)(B), the National Security Act of 1947 was enacted before the date of enactment of the OPEN FOIA Act of 2009. On its face, this federal statute leaves no discretion to agencies about withholding from the public information about intelligence sources and methods. Thus, the protection afforded to intelligence sources and methods by 50 U.S.C. § 3024(i)(1) is absolute. *See CIA v. Sims*, 471 U.S. 159 (1985).

71.    To fulfill its obligation of protecting intelligence sources and methods, the DNI is

---

[18] Section 102A(i)(1) of the National Security Act was previously codified at 50 U.S.C. § 403(i)(1). As a result of the reorganization of Title 50 of the U.S. Code, Section 102A(i)(1) is now codified at 50 U.S.C. § 3024(i)(1).

authorized to establish and implement guidelines for the Intelligence Community (IC) for the classification of information under applicable laws, Executive Orders, and other Presidential Directives, and for access to and dissemination of intelligence. 50 U.S.C. § 3024(i)(1). In implementing this authority, the DNI promulgated Intelligence Community Directive 700, which provides that IC elements shall protect "national intelligence and intelligence sources and methods and activities from unauthorized disclosure."[19] The FBI is one of 18 member agencies comprising the IC, and as such must protect intelligence sources and methods. 50 U.S.C. § 3003(4).

72.      Given the plain Congressional mandate to protect the IC's sources and methods of gathering intelligence, the FBI has determined that intelligence sources and methods would be revealed if any of the withheld information is disclosed to Plaintiffs. Therefore, the FBI is prohibited from disclosing such information under 50 U.S.C. § 3024 (i)(1).[20]

73.      The FBI is asserting Exemption 3 in this case, at times in conjunction with Exemptions 1 and 7(E), to protect information that would reveal intelligence sources and methods. In some instances, information would reveal classified intelligence sources and methods protected by Exemption 1. In some instances, information was protected under Exemption 7(E) because unclassified intelligence sources and methods were employed as law enforcement techniques, procedures, or guidelines, and thus would qualify as both an intelligence source and method under Exemption 3 and a law enforcement technique under

---

[19] Intelligence Community Directive (ICD) 700, dated June 7, 2012, at ¶ E.2.a.

[20] Although 50 U.S.C. § 3024 (i)(1) does not impose a requirement to articulate harm, disclosure of this information presents a bona fide opportunity for individuals to develop and implement countermeasures, resulting in the loss of significant intelligence information, sources, and methods relied upon by national policymakers and the IC to safeguard national security.

Exemption 7(E). Notably, § 3024 (i)(1) protects sources and methods regardless of whether they are classified. *See Sims*, 471 U.S. at 176.

      a.   The information that would reveal intelligence sources and methods appears on three pages of the draft talking points prepared for the FBI Deputy Director by FBI's Office of Congressional Affairs. The pages on which information subject to the National Security Act has been withheld are Bates-numbered FBI 22-cv-676- 678. As detailed more fully at paragraph 85, *infra*, FBI's OCA included information relating to intelligence sources and methods in anticipation of the FBI Deputy Director needing to discuss those topics at a meeting with congressional leaders responsible for intelligence matters.

### EXEMPTION 5: PRIVILEGED INFORMATION

74.    FOIA Exemption 5 exempts from mandatory disclosure "inter-agency" or "intra-agency" memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).

75.    Exemption 5 has been construed to exempt documents or information normally privileged in the civil discovery context, and incorporates the attorney-client, deliberative process, and attorney work product privileges. The attorney-client privilege protects confidential communications from a client to an attorney and from an attorney to a client for the purpose of seeking legal advice. The deliberative process privilege protects predecisional, deliberative communications that are part of a process by which agency decisions are made. It protects opinions, advice, evaluations, deliberations proposals, and recommendations that form part of an agency decision-making process, as well as the selection and sorting of factual information relied upon as part of that decision-making process. The attorney work product privilege protects documents and other memoranda prepared by an attorney or under the direction of an attorney as

part of, or in reasonable anticipation of litigation.

76.     In order to apply Exemption 5, agencies must first satisfy the threshold requirement – *i.e.*, show that the information protected was "inter-agency or intra-agency." Once the threshold is satisfied, agencies must satisfy the elements of the pertinent privilege. With respect to the attorney work product doctrine, agencies must show that the withheld information was created by, or for, an attorney in reasonable anticipation of litigation. With respect to the deliberative process privilege, agencies must show that the withheld information was both predecisional – *i.e.*, antecedent to a final agency decision – and deliberative – *i.e.*, part of the process in which the agency engaged in an effort to reach a final decision (whether or not any final decision was ever reached).

*(b)(5)-1: Deliberative Process Privilege*

77.     Within FOIA Exemption Category (b)(5)-1, the FBI protected deliberative, predecisional materials. The deliberative process privilege protects the internal deliberations of the government by insulating recommendations, analyses, opinions, and other non-factual information comprising the decision-making process; Exemption 5 allows for the withholding of such privileged material – *i.e.,* material that contains, or was prepared in connection with the formulation of, opinions, advice, evaluations, deliberations, policies, proposals, conclusions, or recommendations. The privilege also protects records and information that if disclosed, would reveal an agency's sorting, evaluation, and analysis of facts to make recommendations or reach a final decision.

78.     The FBI relied on Exemption 5 and the deliberative process privilege to protect email communications, draft court documents, and talking points. These materials reflect deliberations integral to reaching final agency decisions, or were key to a decisionmaking process aimed at developing policy. The deliberative email communications, draft court

documents, and talking points are deliberative and pre-decisional. Additionally, in compliance

with the FOIA Improvement Act of 2016, all of this material was created less than 25 years

before the submission of Plaintiff's request.

Email Communications

79.    The FBI asserted Exemption 5 pursuant to the deliberative process privilege to

withhold responsive portions in three (3) categories of email communications.

80.    The 1st category of email communications contains discussions among personnel

in the FBI's Office of General Counsel, Office of the Director, and Office of Public Affairs

concerning a draft statement for the FBI to consider using in responding to press inquiries about

the seizure of former President Trump's passports. These email communications are Bates-

numbered FBI 22-cv-1921-550, FBI 22-cv-1921-552, FBI 22-cv-1921-554-555, FBI 22-cv-

1921-557-558, FBI 22-cv-1921-560-561, FBI 22-cv-1921-563-564, FBI 22-cv-1921-566-568,

FBI 22-cv-1921-570-572, FBI 22-cv-1921-574-576, FBI 22-cv-1921-578-580, FBI 22-cv-1921-

582-586, FBI 22-cv-1921-589-592, FBI 22-cv-1921-594-597, FBI 22-cv-1921-599-602, FBI 22-

cv-1921-604-607, FBI 22-cv-1921-609-612, and FBI 22-cv-1921-614-617.

a.    The first message in this email chain is a message from the DOJ Office of Public

Affairs (OPA) to its FBI counterpart, the FBI Office of Public Affairs, in which

the DOJ OPA provided a recommended press statement for the FBI OPA to issue.

This first message represents a recommendation from a peer office, and was not

binding on FBI OPA, but rather intended to guide its public messaging around a

politically sensitive topic. DOJ OPA's message also came before any eventual

decision by FBI about what statement to release, if any.

b.    FBI OPA subsequently forwarded the message from DOJ OPA to several

individuals in FBI's Office of General Counsel and FBI's Office of the Director,

30

asking for recommendations on the content of the message. Thereafter, personnel

in the FBI's Office of General Counsel, Office of the Director and Office of

Public Affairs conferred internally about DOJ's proposal, recommending

additions, deletions, and clarifications to the content of the statement in

successive messages. The FBI's process for developing external communications

often follows this template, in which FBI OPA receives, synthesizes, and refines

recommendations (from outside the agency) and leadership input (from within) in

order to craft a final message for the consideration of agency leadership. Because

each successive response included the messages sent before it, much of the

material on these pages is repeated multiple times.

81.    The 2nd category of email communications[21] contains three discussions between

and among FBI personnel, personnel in the Office of the Attorney General in DOJ, personnel in

the Office of the Deputy Attorney General in DOJ, and personnel in DOJ's National Security

Division concerning two draft court filings.

a.    The page Bates-numbered FBI 22-cv-1921-434 contains a single email message

sent by an attorney in the FBI Office of the General Counsel to an attorney in the

DOJ Office of the Deputy Attorney General. The communication concerns a

draft, attached to the email, of an affidavit in support of a search warrant

application (that draft is a responsive record Bates-numbered FBI 22-cv-1921-

502-528). The FBI attorney's message contains deliberative content regarding two

issues:  the proper scope of the search that would result from a warrant (if

granted), and the appropriate content of the affidavit. Specifically, in the email,

---

[21] Bates-numbered FBI 22-cv-1921-434, FBI 22-cv-1921-459, and FBI 22-cv-1921-626.

the FBI attorney offers his substantive policy and legal views on the scope of the search and the affidavit's content. The DOJ attorney was not bound by the FBI attorney's advice; rather, the advice was intended to guide the DOJ attorney's decisionmaking process about the eventual scope of the search and the content to be included in the draft.

b.  The second email exchange in this category, on Bates-numbered page FBI 22-cv-1921-459, contains two messages. The earlier message is from an attorney in the Department of Justice's National Security Division. That attorney writes to an attorney in the FBI's Office of General Counsel, seeking edits and comments on a draft of an affidavit in support of a search warrant application. The content of the discussion suggests that the draft under consideration is a version of the draft affidavit included in the responsive files processed here (Bates-numbered FBI 22-cv-1921-502-528); however, because the responsive email message had no attachment, FBI cannot be certain that the draft under discussion in prior messages is the same version as was processed here. In response to the DOJ attorney's email, the FBI attorney offers his substantive views on the scope of the search and material to be included in the affidavit. The context in which the emails were exchanged is similar to that which was identified in the preceding paragraph; specifically, in that DOJ attorneys, who bore ultimate responsibility for the contents of the affidavit and the scope of the search, solicited advice from peer attorneys in the FBI about those issues. Additionally, this advice was solicited and offered before eventual decisions on the content of the affidavit and

scope of the search were made, rendering the exchange predecisional.

c.  The third email exchange in this category, on Bates-numbered page FBI 22-cv-1921-626, contains three messages. The earliest message is from an individual in the FBI's Office of the Director to an attorney in the Office of the Attorney General and an attorney in the Office of the Deputy Attorney General, referring to an earlier conversation. The next message is a reply from the attorney in the Office of the Deputy Attorney General to the original email recipients in which the ODAG attorney provides a draft of the redaction proposal relating to the affidavit in support of the government's search warrant application and discusses that draft redaction proposal. That draft is a responsive record Bates-numbered FBI 22-cv-1921-627-639. The attorney in the Deputy Director's Office then forwards the draft to other employees in the FBI's Office of the Director.

d.  The contexts in which these three sets of emails were exchanged is typical for FBI's provision of substantive input on DOJ's litigating positions (and the documents that reflect them). Specifically, as they did here, senior FBI officials often assist the DOJ to formulate the Department's eventual litigating positions through the exchange of written feedback on draft filings.

82.    The 3rd category of email communications includes an email sent by AD Jill C. Tyson in the FBI's Office of Congressional Affairs to FBI Deputy Director Paul M. Abbate concerning draft remarks OCA prepared for Mr. Abbate in anticipation of a meeting with the congressional "Gang of Eight"[22] about the records that are the subject of this FOIA request. FBI

---

[22] The term "Gang of Eight" refers to eight members of Congress with responsibility for intelligence matters. This group includes the leadership of both parties in the U.S. House and U.S. Senate, as well as the chairs and ranking members of the intelligence committees in each house.

OCA is responsible for assisting Bureau leadership to develop and refine congressional messaging through exchanges like this. The remarks, which were attached to the email, appear in this production as Bates-numbered pages FBI 22-cv-1921-675-678. The email, which appears in identical form on two pages (Bates-numbered FBI 22-cv-1921-674 and FBI 22-cv-1921-679), has been redacted to remove Ms. Tyson's substantive recommendations regarding the briefing. These comments were offered from a subordinate to a decisionmaker, and represent a predecisional effort to provide helpful commentary on an upcoming meeting between the Deputy Director and members of Congress.

<u>Draft Court Documents</u>

83.     The first draft filing protected in full by the deliberative process privilege, Bates-numbered FBI 22-cv-1921-502-528, is a draft affidavit prepared in support of a search warrant application in the Mar-a-Lago investigation. The draft was prepared by a team of DOJ attorneys staffed on the Mar-a-Lago investigation. Those attorneys anticipated that a final version of their draft would be filed, and intended the views advanced in the draft to represent their recommendations on the ideal litigating positions for the Department to take. Drafts like this one, prepared in support of a criminal investigation, are often circulated to attorneys internally (within DOJ) and to FBI attorneys to solicit feedback and critique as the Department coalesces around a final litigating position. That process was followed here, where this draft was used as a tool not only to distill and clarify the drafting team's views on the ideal content of the affidavit, but to solicit opinions from others within the FBI and DOJ on the same. At a point in time after this draft was prepared and circulated, a final version of it was filed.

84.     The second draft filing protected in full by the deliberative process privilege, Bates-numbered FBI 22-cv-1921-627-639, is a draft document proposing redactions to the final

version of the affidavit referred to above. The draft was prepared by a team of DOJ attorneys staffed on the Mar-a-Lago investigation. The document was drafted in response to a court order in *In Re Sealed Search Warrant*, Case No. 22-MJ-8332 (S.D. Fla.), in which the court decided to unseal the affidavit and ordered the government to propose redactions to the public version. Those attorneys subjectively anticipated that an eventual version of their draft would be filed in response to the court's order, and intended the views advanced in the draft to represent their recommendations on the ideal litigating positions for the Department to take. Drafts like this one, prepared in support of a criminal investigation, are often circulated to attorneys internally (within DOJ) and to FBI attorneys to solicit feedback and critique as the Department coalesces around a final litigating position. That process was followed here, where this draft was used as a tool not only to distill and clarify the drafting team's views on the ideal content of the affidavit, but to solicit opinions from others within the FBI and DOJ on the same. At a point in time after this draft was prepared and circulated, a final version of it was filed.

<u>Talking Points</u>

85.    The deliberative process privilege protects draft talking points that were prepared by FBI's Office of Congressional Affairs (and sent by its Assistant Director, Jill Tyson) for the agency's Deputy Director, Paul Abbate, in anticipation of a meeting between Mr. Abbate and the Congressional Gang of Eight concerning the Mar-a-Lago investigation, including the intelligence-related concerns the investigation raised. The talking points originated within FBI (specifically, OCA) and were disseminated only within FBI. Additionally, the talking points were only suggestions, as the Deputy Director retained discretion to follow or depart from them. The four pages in question (Bates-numbered FBI 22-cv-1921-675-678) contain recommendations on messaging substance. The office that issued the draft talking points, OCA, is responsible for recommending messaging to Congress (as it did here) for agency leadership.

OCA staff anticipated that at the meeting, the Deputy Director might be confronted with a need to discuss classified information related to the subject of Plaintiff's request.

Segregability

86.    The FBI endeavored to segregate non-deliberative facts, whenever possible, and only withheld such material when it found it was inextricably intertwined with agency deliberations.

*(b)(5)-2: Attorney Client Privilege*

87.    In Exemption category (b)(5)-2, the FBI protected privileged attorney-client communications. The attorney-client privilege is appropriately asserted to protect confidential communications between a client and a professional legal adviser, when the client is seeking legal advice from the professional legal adviser in the professional legal adviser's capacity as a lawyer. Such communications are permanently protected from disclosure by the legal adviser unless the client waives the protection. This privilege encompasses confidential communications made to an agency attorney by decision-making personnel as well as lower echelon employees who possess information relevant to an attorney's advice-rendering function. Disclosure of communications between the FBI/DOJ attorneys and their clients would inhibit candor between the clients and their attorneys in relation to the issues about which they are seeking legal advice. Such candor and full disclosure is necessary to ensure that thorough and sound legal advice is provided.

88.    The FBI protected confidential communications between and among FBI counsel and FBI employees (their clients), that reflect the seeking and/or providing of legal advice. Specifically, the FBI redacted information appearing in a single email chain dated Monday, August 15, 2022. Information has been redacted under the attorney-client privilege on the pages Bates-numbered FBI 22-cv-1921-550, FBI 22-cv-1921-552, FBI 22-cv-1921-554-555, FBI 22-

cv-1921-557-558, FBI 22-cv-1921-560-561, FBI 22-cv-1921-563-564, FBI 22-cv-1921-566-568,

FBI 22-cv-1921-570-572, FBI 22-cv-1921-574-576, FBI 22-cv-1921-578-580, FBI 22-cv-1921-

582-586, FBI 22-cv-1921-589-592, FBI 22-cv-1921-594-597, FBI 22-cv-1921-599-602, FBI 22-

cv-1921-604-607, FBI 22-cv-1921-609-612, and FBI 22-cv-1921-614-617. The high number of

pages in this email chain is attributable to the fact that each response includes underneath it all of

the prior responses in the chain. The email chain begins with an email message from Anthony

Coley, Director of U.S. Department of Justice's Office of Public Affairs, to Catherine Milhoan,

Assistant Director of the FBI's Public Affairs Office, copying Marshall Miller in the Office of

the Deputy Attorney General. The body of Mr. Coley's email to Ms. Milhoan contains a draft

statement for the FBI to consider using in responding to press inquiries about the seizure of

former President Trump's passports. Because of the feature identified above—namely, that each

successive email message contains duplicated versions of preceding emails—Mr. Coley's single

email is duplicated seventeen times throughout the records released in part.

89.     When the FBI releases press statements concerning open criminal investigations,

it must be careful not to prejudice ensuing legal proceedings, or infringe on the rights of any

potential subjects of investigation. At the time of the press statement discussed here, charges had

not yet been brought in connection with the Mar-a-Lago investigation. Therefore, any press

statement concerning the subject could implicate the personal privacy rights of an individual

related to it, and could lead to litigation (including related to potential violations by the FBI of

the Privacy Act). In addition, the DOJ has promulgated a regulation detailing the many legal

considerations that must be taken into account when communicating with the press regarding a

criminal proceeding. 28 C.F.R. § 50.2. FBI personnel obligated to follow this regulation.

90.     Ms. Milhoan forwarded Mr. Coley's proposed press statement to a group of FBI

personnel, including representatives from the FBI Office of the Director (DO) and Office of General Counsel (OGC), as well as other FBI OPA personnel. One of the personnel included was the FBI's General Counsel, Jason Jones. The OGC attorneys on this chain served in their role as attorneys by providing legal advice at their clients' requests.

91.     In response to Ms. Milhoan's email forwarding DOJ's proposal and soliciting advice on its content, personnel from OGC, OPA, and DO weighed in.

92.     The emails from the OGC attorney contain legal advice on the statement's content intended either, depending on the specific message, (1) to reduce the risk of adverse litigation outcomes related to the press statement like those identified above, or (2) to offer her substantive views on the legal issues raised in the statement.

93.     The redacted portions of the responses from DO and OPA contain content in which their authors propose their views of the press statement, or respond to views raised by others, with a primary purpose of obtaining OGC's advice and comment on those responses.

94.     These communications were made in confidence, were not shared with or circulated to individuals outside the attorney-client relationship, and were made for the purpose of securing legal assistance or advice in relation to government legal positions. Release of this information would call into question the FBI's commitment to withhold confidential information shared between agency clients and attorneys and could dissuade agency attorneys and clients from fully sharing such information, and endanger agency attorneys' ability to provide the best possible legal representation of their clients. Furthermore, it would provide advantage to individuals seeking legal action against the government and/or those targeted for prosecution by the government. It would provide information traditionally privileged in a legal context, and disrupt the adversarial process of litigation by providing access to information related to the

government's potential legal strategies. Accordingly, the FBI properly withheld these privileged communications pursuant to Exemption 5.

*(b)(5)-3: Attorney Work Product*

Email Communications

95.     The first of four email exchanges withheld in full under the attorney work-product privilege appears on a single page Bates-numbered FBI 22-cv-1921-434. This page contains a message from an attorney in the FBI General Counsel's office to an attorney in the DOJ's Office of the Deputy Attorney General, which was subsequently forwarded to another senior FBI official. The exchange includes the FBI attorney's comments on the draft affidavit prepared in support of a search warrant application, which was attached to the email. The two senders of these messages, both attorneys, subjectively anticipated that a final version of the draft affidavit would eventually be filed.

96.     The second of four email exchanges withheld in full under the attorney work-product privilege appears on a single page Bates-numbered FBI 22-cv-1921-459. This page contains two exchanges between attorneys in DOJ's National Security Division and FBI's Office of General Counsel in which the attorneys discussed the content of the draft affidavit. Because the email that was a responsive record here contains no attachment, it is not clear that the exact version of the affidavit under discussion is the same as the one included within the records responsive to Plaintiff's request. Even so, the context of the discussion heavily implies that the same affidavit, albeit perhaps in an earlier or later version, is under discussion. The two exchanges described were forwarded to another senior FBI official. The three senders of these messages, all attorneys, subjectively anticipated that a final version of the draft affidavit would eventually be filed.

97.     The third of four email exchanges withheld in full under the attorney work-

product privilege appears on a single page Bates-numbered FBI 22-cv-1921-626. This page contains three messages among senior FBI officials and attorneys from DOJ's Office of the Attorney General and ODAG in which those officials and attorneys discuss the draft redaction proposal discussed at paragraph 100, *infra*. The three senders of these messages, all attorneys or individuals working in close concert with attorneys, subjectively anticipated that a final version of the draft proposal under discussion would eventually be filed.

98.     The fourth and final email exchange withheld under the attorney work-product privilege appears on a single page Bates-numbered FBI 22-cv-1921-644. This page contains messages among senior FBI officials and attorneys. The discussion centers around a recent court opinion that was released, that had relevance to the Mar-a-Lago investigation and ensuing prosecutions. The messages withheld all contain confidential communications regarding active litigation.

<u>Draft Court Filings</u>

99.     The first draft filing protected in full by the attorney work-product privilege, Bates-numbered FBI 22-cv-1921-502-528, is a draft affidavit prepared in support of a search warrant application in the Mar-a-Lago investigation. The draft was prepared by a team of DOJ attorneys staffed on the Mar-a-Lago investigation. Those attorneys subjectively anticipated that an eventual version of the draft they prepared would be filed with a magistrate judge to obtain a search warrant in that investigation. A final version of the draft was eventually filed. Prosecution often, though not always, results from criminal investigations of the sort the DOJ attorneys were working on.

100.    The second draft filing, Bates-numbered FBI 22-cv-1921-627-639, is a draft document proposing redactions to the final version of the affidavit referred to above. The draft

was prepared by a team of DOJ attorneys staffed on the Mar-a-Lago investigation. The document

was drafted in response to a court order in *In Re Sealed Search Warrant*, Case No. 22-MJ-8332

(S.D. Fla.), in which the court decided to unseal the affidavit and ordered the government to

propose redactions to the public version. Those attorneys subjectively anticipated that an

eventual version of their draft would be filed in response to the court's order. A final version of

their draft was eventually filed. Evidence obtained from the search (based on the warrant in

support of which the affidavit was filed) was used in bringing the criminal charges in the

Classified Documents Prosecution.

*Foreseeable Harm Analysis*

101.    The release of any of the materials, in whole or part, that the FBI has withheld

under Exemption 5 would lead, in the specific contexts in which the agency decisions at issue

were made, to the precise types of harms the Exemption is intended to prevent.

102.    As a general matter, the protections of the deliberative process privilege are

predicated on the recognition that release of this privileged information would inhibit the

government's development of policy and stifle its decision-making process. Furthermore,

exempting such material from disclosure protects against public confusion that might result from

the disclosure of preliminary opinions and information that do not, in fact, reflect the final views

or policies of the FBI. The exemption and privilege together protect not only documents but also

the integrity of the deliberative process itself where exposure of the process would result in

harm. The FBI invokes Exemption 5 and the deliberative process privilege because FBI

employees would hesitate to offer their candid and conscientious opinions to superiors or

coworkers if they knew that their opinions of the moment might become a matter of public

record in the future, and because such self-censorship would, in turn, degrade the quality of

agency decisions by depriving the decision-makers of fully-explored options developed from robust debate.

103.    The harms to be prevented by the FBI's assertion of the attorney work-product privilege are, in this case, largely coextensive with those to be prevented to be prevented by its assertion of the deliberative process privilege.  The drafts and communications protected as attorney work product here reflect the deliberations of agency lawyers about the appropriate content of a court filing, which is a form of policy judgment (in addition to underlying legal judgments that are not policy-driven).

104.    The harms detailed below must be considered against the backdrop of the Mar-a-Lago investigation, which has attracted significant public attention and scrutiny.  The presence of that public attention and scrutiny heightens the need for FBI personnel to be able to develop final positions in a closed atmosphere, where they feel free to air their (often tentative) views in an honest manner.

105.    By withholding these documents, the FBI seeks to prevent a loss of candor in its deliberative processes.  Two specific processes are implicated here:  the process of refining (in conjunction with DOJ) a legal position to take in an ongoing criminal investigation, and the process of developing an external communications strategy vis-à-vis two institutions—the press and Congress.

106.    Candor played a significant role in maintaining the high quality of the affidavit and redaction proposal at issue, both of which were filed in final versions of the drafts that are responsive records here.  FBI leadership regularly provides written feedback on draft filings in criminal cases prepared by DOJ, as it did here.  Through a candid inter-agency exchange of views, the FBI is able to offer its honest opinion on issues like the appropriate scope of a Fourth

Amendment search or the appropriate redactions to make to a public version of that affidavit, improving the quality of the final product along the way. I believe that ultimately, the FBI's candid feedback during this process improves the final filed version with respect to the views of the law advanced, and the weighing of the equities taken into consideration. One aspect of the value to participation by both FBI and DOJ in the process of developing litigation positions is that the agencies bring distinct, valuable perspectives and institutional cultures to bear on the problems they confront. These factors have contributed, in my view, to the DOJ's strong reputation as an impartial administrator of the law.

107.    The FBI also depended on candor in preparing the external messaging relevant here. In both scenarios—the development of talking points for a meeting with Congress, and the development of a statement to give the press regarding the Mar-a-Lago search—FBI leadership depended on the substantive expertise, shared through a candid exchange of views, from its expert staff in the Office of Congressional Affairs and the Office of Public Affairs. FBI leadership also benefits from recommendations from peer agencies, especially DOJ, when the substance of its communications relate to collaborative efforts like the Mar-a-Lago investigation.

108.    Candor is important in the scenarios described above because of the differing perspectives and expertise that different agencies and offices bring to bear on particular issues. Specifically, I believe that DOJ filings improve with candid feedback from FBI leadership, and FBI leadership communications strategies are improved by (again, candid) input from OPA and OCA.

109.    If disclosed, the drafts of documents later filed or made public could be compared line by line to the final versions, decreasing the likelihood that their authors would put forward

candid litigating or public relations views on sensitive topics in the future.

110.    If the records withheld (in part or in full) were released, FBI personnel in the future would be less likely to contribute their views on draft filings and on communications strategies openly and candidly.  The impairment of candor would be felt not only between the FBI and DOJ, but also between FBI's constituent offices and the FBI leadership.  A loss of candor would, in turn, diminish the quality of the agency's decisionmaking.

111.    A related risk present is that attorneys working on sensitive investigations, or on issues related to those investigations, might instead opt into sharing their substantive views orally (including by telephone).  Because the FBI collaborates internally and with DOJ in large-number teams, such a result would inhibit internal communication.  A move to oral communication at the expense of written communication would also decrease the quality of record-keeping within the FBI, to the detriment of those seeking to understand the Bureau's decisionmaking processes in the future.

112.    Disclosure of the Exemption 5 materials would pose a second risk of confusing the public. All of the materials referred to—drafts and comments alike—contain non-final views of particular authors within the FBI and DOJ.  If made public, these views might improperly be considered the agencies' final positions on contentious topics, putting present messaging efforts at risk. The FBI is meticulous and precise in its public communications about ongoing investigations and prosecutions—in general, as in this case, such communications are rare. Additionally, the drafts at issue may well have been incomplete or partial. Were an incomplete draft incorrectly construed as DOJ's final position, particularly in such a sensitive case, the public might inappropriately conclude that DOJ had omitted arguments important to its case or

had adopted a position it did not take.

113.    Finally, disclosure of the Exemption materials would risk decreasing the quality of advice provided by FBI OGC to its clients in the OPA and Office of the Director in high-profile cases. Specifically, in this case, OPA and DO personnel solicited the legal advice of OGC attorneys, who provided candid and useful commentary on a consequential, contentious press statement. If the clients' requests for legal advice were disclosed in future high-stakes situations like these, FBI client offices would be less likely to seek OGC input. Similarly, OGC attorneys would be less likely to offer legal advice, including in writing. In turn, worse legal advice would likely both increase the risk of diminished public confidence in the FBI's exercise of its law enforcement function, as well as exposing the Bureau to greater litigation risk.

*EXEMPTION 7:  LAW ENFORCEMENT INFORMATION*

*Exemption 7 Threshold*

114.    Before an agency can invoke any of the harms enumerated in Exemption (b)(7), including Exemptions 7(A) and 7(E) (which were invoked over the records at issue here), it must first demonstrate that the records or information at issue were compiled for law enforcement purposes. Pursuant to 28 U.S.C. §§ 533 and 534, Executive Order 12,333 as implemented by the Attorney General's Guidelines for Domestic FBI Operations (AGG-DOM), and 28 C.F.R. § 0.85, the FBI is the primary investigative agency of the federal government with authority and responsibility to investigate all violations of federal law not exclusively assigned to another agency, to conduct investigations and activities to protect the United States and its people from terrorism and threats to the national security, and to further the foreign intelligence objectives of the United States. Under this investigative authority, the responsive records herein were compiled for the following law enforcement purposes.

115.    The records at issue were created and compiled in furtherance of the FBI's role in

an active criminal investigation concerning the potential improper removal and storage of

classified information in unauthorized spaces, as well as the potential unlawful concealment or

removal of government records. Thus, the FBI determined they were created and compiled for a

law enforcement purpose.

*Exemption (b)(7)(A)*

116.    FOIA Exemption 7(A) exempts from disclosure records or information compiled

for law enforcement purposes, but only to the extent that the production of such law enforcement

records or information…could reasonably be expected to interfere with enforcement

proceedings. 5 U.S.C. § 552(b)(7)(A).

117.    Application of this exemption requires: the existence of law enforcement records;

a pending or prospective law enforcement proceeding; and a determination that release of the

information could reasonably be expected to interfere with the enforcement proceeding. Within

the processed records, the FBI asserted Exemption 7(A) in a limited fashion to protect

information concerning the subjects of a pending FBI investigation. The release of this

information would reveal unknown information concerning pending enforcement procedures, to

include the existence of unknown investigations. The FBI determined release of any of this

material would provide criminals with information about the government's

investigation/enforcement strategies in ongoing matters, allow them to predict and potentially

thwart these strategies, and/or allow them to discover/tamper with witnesses and/or destroy

evidence. As such, revealing this information could reasonably be expected to interfere with

pending enforcement proceedings. Thus, the FBI has applied Exemption 7(A) to protect this

information within the processed records located outside of the FBI's pending investigative file.

118.    Some of the information from the investigative file is excerpted in the non-

investigative materials processed in this case. That information has been withheld pursuant to

Exemption 7(A). An explanation of the FBI's rationale for categorically withholding investigative file materials may be found below.

119.    Portions of those investigative file records appear, and have been withheld, on the following Bates-numbered pages, which are draft court documents; emails in which deliberative, substantive commentary on those documents is offered; or draft talking points:  FBI 22-cv-1921-434, FBI 22-cv-1921-509-524, FBI 22-cv-1921-630-636, FBI 22-cv-1921-638, and FBI 22-cv-1921-678.

*Exemption (b)(7)(E):  Investigative Techniques and Procedures*

120.    FOIA Exemption (b)(7)(E) provides protection for:

> law enforcement records [which]…would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.

5 U.S.C. § 552(b)(7)(E).

121.    The FBI asserted Exemption (b)(7)(E) to withhold information from these records, the release of which would disclose techniques and/or procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.

122.    Within the responsive documents, the FBI applied Exemption (b)(7)(E) to non-public investigative techniques and procedures utilized by the FBI to pursue its law enforcement mission, and also to non-public details about techniques and procedures that are otherwise known to the public. Specifically, the FBI asserted Exemption 7(E) to protect the following categories of information.

<u>(b)(7)(E)-2: Identity of an FBI Division</u>

123.    In Exemption category (b)(7)(E)-2, the FBI protected methods and techniques

involving the identity of an FBI division on a single page of the responsive records. Disclosure of the identity of the division conducting the investigation would reveal the targets and the physical areas of interest of the investigation, and when taken together with other information, could establish a pattern or "mosaic". Once identified, the division's area of expertise would become known and the targets of the investigation would be able to discern the investigative strategies deployed by the FBI. Certain FBI divisions are highly specialized, and are involved in deploying particular investigative techniques and procedures. Revealing their involvement in the investigation discussed in the processed records would reveal non-public details concerning which techniques and procedures were deployed in certain investigative circumstances, and subsequently allow for criminals to predict the FBI's use of these techniques and procedures in similar investigative circumstances. This would allow them to discover and circumvent the deployment of these techniques and procedures, greatly reducing their effectiveness.

124.    Information that would improperly reveal the identity of an FBI division was withheld in the following locations:

a.    On the page Bates-numbered FBI 22-cv-1921-503, in a draft affidavit in support of a search warrant application. The information withheld on this page concerns FBI division in which the affiant works.

125.    In summary, the FBI withheld the involvement of a particular division to prevent criminals from adjusting their behavior and activities to circumvent FBI law enforcement efforts. Accordingly, the FBI properly asserted Exemption 7(E) to withhold this information.

(b)(7)(E)-3: Internal FBI Telephone Numbers, Email Addresses and
Internet/Web Addresses[23]

126.     In Exemption category (b)(7)(E)-3, the FBI withheld non-public telephone

numbers, e-mail addresses, and non-public intranet/web addresses. More specifically, this type of

information could provide criminals with specific targets for possible cyber-attacks and other

types of attacks on FBI secure communications. Considering the current cyber-security

environment where government data breaches and other hacking attempts on government

systems are prevalent, it is likely that the release of this type of information could provide

hackers with avenues to exploit the FBI's Information Technology system. It is possible they

could use this information to gain unauthorized access to FBI systems, view and/or manipulate

sensitive investigative data, interfere with the FBI's non-public intranet protocol, and/or hinder

the FBI's ability to enforce the law by disrupting the FBI's internal communications. Releasing

this information poses substantial risks to FBI information systems, could potentially decrease

the FBI's effectiveness, and could enable criminals to circumvent the law. In addition, releasing

non-public telephone numbers would provide criminals with specific targets for attacks on FBI

communications through "spoofing" or other illegal means.[24] For example, "spoofing" occurs

when a criminal disguises a communication from an unknown source to appear as if the

---

[23] Upon further review, the FBI is no longer asserting FOIA Exemption (b)(7)(E)-3 to withhold the identity of an FBI Headquarters Room Number contained on Bates-numbered pages FBI 22-cv-1921-529, FBI 22-cv-1921-532, and FBI 22-cv-1921-538.  The FBI will re-process these three (3) pages of records to release this non-exempt information.

[24] As recently as June 3, 2021, DOJ's Executive Office for Immigration Review (EOIR) announced it was notified of phone calls that spoofed the Office of the Chief Immigration Judge as part of a misinformation campaign. Callers spoofed the Office of the Chief Immigration Judge's main line so that calls would appear to be coming from EOIR on the recipient's caller ID. The caller then posed as an EOIR employee and sought personal information from the victims. *See*:  https://www.justice.gov/eoir/pr/eoir-warns-scammers-spoofing-agency-phone-number, last accessed August 21, 2024.

communication is coming from a known, trusted source. Spoofing occurs with emails, telephone calls, and websites. Criminals often use social engineering techniques to elicit sensitive information from the unsuspecting victim. This can be especially dangerous when criminals spoof numbers of law enforcement agencies so as to appear as if they are from official law enforcement agencies. Victims of such crimes often feel a higher responsibility to respond to questioning and have an expectation that the information they provide will only be used for official law enforcement purposes. Releasing this information poses substantial risks to the FBI's ability to carry out its mission effectively, could potentially decrease the FBI's effectiveness, and could enable criminals to circumvent the law. Accordingly, the FBI asserted Exemption 7(E) to withhold this information.

127.    Email addresses were withheld on the following Bates-numbered pages:  FBI 22-cv-1921-49, FBI 22-cv-1921-270-278, FBI 22-cv-1921-324, FBI 22-cv-1921-434, FBI 22-cv-1921-459, FBI 22-cv-1921-530-531, FBI 22-cv-1921-533, FBI 22-cv-1921-536-537, FBI 22-cv-1921-539-540, FBI 22-cv-1921-543, FBI 22-cv-1921-546, FBI 22-cv-1921-548, FBI 22-cv-1921-550, FBI 22-cv-1921-552-555, FBI 22-cv-1921-557-558, FBI 22-cv-1921-560-561, FBI 22-cv-1921-563-564, FBI 22-cv-1921-566-568, FBI 22-cv-1921-570-572, FBI 22-cv-1921-574-576, FBI 22-cv-1921-578-586, FBI 22-cv-1921-589-592, FBI 22-cv-1921-594-597, FBI 22-cv-1921-599-602, FBI 22-cv-1921-604-607, FBI 22-cv-1921-609-612, FBI 22-cv-1921-614-617, FBI 22-cv-1921-619-620, FBI 22-cv-1921-626, FBI 22-cv-1921-640, and FBI 22-cv-1921-644.

128.    Internal FBI telephone numbers were withheld on the following Bates-numbered pages:  FBI 22-cv-1921-271, FBI 22-cv-1921-274, FBI 22-cv-1921-278, FBI 22-cv-1921-324, FBI 22-cv-1921-529, FBI 22-cv-1921-532, FBI 22-cv-1921-538, FBI 22-cv-1921-550, FBI 22-cv-1921-552, FBI 22-cv-1921-554-555, FBI 22-cv-1921-557, FBI 22-cv-1921-560-561, FBI 22-

cv-1921-563-564, FBI 22-cv-1921-566-567, FBI 22-cv-1921-570-572, FBI 22-cv-1921-574-576,

FBI 22-cv-1921-578-580, FBI 22-cv-1921-583, FBI 22-cv-1921-585-586, FBI 22-cv-1921-589,

FBI 22-cv-1921-591, FBI 22-cv-1921-595-597, FBI 22-cv-1921-600-602, FBI 22-cv-1921-604,

FBI 22-cv-1921-606, FBI 22-cv-1921-609-612, FBI 22-cv-1921-614-617, FBI 22-cv-1921-626,

FBI 22-cv-1921-644, FBI 22-cv-1921-674, and FBI 22-cv-1921-679.

129.    Internal FBI web addresses were withheld on the following Bates-numbered

pages:  FBI 22-cv-1921-50, FBI 22-cv-1921-66, FBI 22-cv-1921-90, FBI 22-cv-1921-111, FBI

22-cv-1921-228, FBI 22-cv-1921-246, FBI 22-cv-1921-284, FBI 22-cv-1921-300, FBI 22-cv-

1921-351, FBI 22-cv-1921-370-371, FBI 22-cv-1921-387, FBI 22-cv-1921-468, and FBI 22-cv-

1921-481.

<u>(b)(7)(E)-4: Collection and Analysis of Information</u>

130.    In Exemption category (b)(7)(E)-4, the FBI protected the methods the FBI uses to

collect and analyze information it obtains for investigative purposes. The release of this

information would disclose the identity of methods used in the collection and analysis of

information, including how and from where the FBI collects information and the methodologies

employed to analyze it once collected. Such disclosures would enable subjects of FBI

investigations to circumvent similar currently used techniques, in the Mar-a-Lago investigation

and in future investigations. The relative utility of these techniques could be diminished if the

actual techniques were released in this matter. This in turn would facilitate the accumulation of

information by investigative subjects regarding the circumstances under which the specific

techniques were used or requested and the usefulness of the information obtained. Release of this

type of information would enable criminals to educate themselves about the techniques

employed for the collection and analysis of information and therefore allow these individuals to

take countermeasures to circumvent the effectiveness of these techniques and to continue to

violate the law and engage in intelligence, terrorist, and criminal activities. Accordingly, the FBI has properly withheld this information pursuant to FOIA Exemption 7(E).

131.    Specifically, information withheld pursuant to Exemption category (b)(7)(E)-4 is present in the following locations:

a.    In the draft affidavit to support a search warrant application, on pages FBI 22-cv-1921-509-524. These pages detail the basis for the government's assertion of probable cause to issue a search warrant. If revealed, they would give insight into the methods by which the government obtained that information, jeopardizing witness safety and the integrity of future witness testimony. They would also enable evasion of an ongoing investigation relying on the same sources of information.

b.    On the pages Bates-numbered FBI 22-cv-1921-630-636 and FBI 22-cv-1921-638. These pages are part of a draft court filing proposing redactions to the final version of an affidavit, a draft of which is Bates-numbered FBI 22-cv-1921-502-528. The affidavit, which is described in the preceding paragraph, contains information relating to the government's assertion of probable cause in a search warrant application. That search warrant was sought and obtained in an ongoing investigation. If released, the material on pages FBI 22-cv-1921-630-636 and FBI 22-cv-1921-638 would give insight into the methods by which the government obtained that information, jeopardizing witness safety and the integrity of future witness testimony, as well as endangering future investigative efforts by the same means.

c.    On the page Bates-numbered FBI 22-cv-1921-434, which contains an email

discussing the content of the draft affidavit referred to above.

d.  On two pages in the draft talking points prepared by FBI OCA for the Deputy
    Director. The pages are Bates-numbered FBI 22-cv-1921-677-678. The redacted
    information appears amid a discussion of intelligence sources and methods as
    applied at Mar-a-Lago, which, if revealed, would explain how intelligence has
    been collected and analyzed there (in the course of the ongoing investigation).

e.  On five pages of email communications (Bates-numbered 22-cv-1921-543-546
    and 548), which were withheld in full because they contain exclusively a
    discussion of personnel staffed on the Mar-a-Lago investigation.  If disclosed, this
    information would risk revealing a connection between those personnel and the
    methods by which the FBI has collected and analyzed information in this
    investigation.

### (b)(7)(E)-5: Investigative Focus of Specific Investigations

132.    In Exemption category (b)(7)(E)-5, the FBI protected the focuses of specific FBI
investigations. These focuses have not been publicly disclosed. Revealing this information to
investigative targets would alert them to the FBI's interest in their activities, allowing them to
take active measures to conceal/destroy evidence or modify their behavior to avoid future
investigative scrutiny. This would allow these criminal elements to predict the FBI's
investigative strategies, and modify their activities or operation security measures to thwart FBI
investigative efforts. Additionally, release of this information in the context of the investigative
records at issue would provide criminal elements a preview of how the FBI will respond to
similar investigative situations, allowing them to preemptively deploy countermeasures to
disrupt FBI investigative efforts of their own, unrelated activities.

133.    Release of this type of information would also reveal key information about FBI

intelligence gathering capabilities. Revealing when and why the FBI pursues or shifts investigative focuses would reveal key information about the types of investigative intelligence the FBI possessed at particular points in time, and possibly when and how such information was obtained. This could enable criminal elements to discover non-public details about FBI intelligence/evidence gathering methods, and help them determine how they might modify their operational security to deprive the FBI of such critical intelligence/evidence.

134. In summary, releasing the focus of specific FBI investigations would allow targets of these investigations to thwart FBI efforts to investigate/disrupt their activities; stunt the FBI's broader strategies for pursuing interrelated investigations; provide key information about FBI investigative strategies for pursuing specific investigations; and reveal key information about the FBI's intelligence and evidence gathering capabilities. Therefore, as release of this information would enable criminals to circumvent the law, the FBI withheld this information pursuant to Exemption 7(E).

135. Information protected by Exemption category (b)(7)(E)-5 appears in the following locations:

    a.    In the draft affidavit in support of a search warrant application, on the pages Bates-numbered FBI 22-cv-1921-509-524. The relevant material discusses the prosecution's evidence of probable cause to search the premises in question. That evidence was obtained through investigatory efforts that would, if revealed, show the FBI's investigative focus, leading to the harms detailed above.

    b.    In the draft court filing proposing redactions of the affidavit described above, on the pages Bates-numbered FBI 22-cv-1921-630-636 and FBI 22-cv-1921-638. The relevant material discusses the prosecution's evidence of probable cause to

search the premises in question. That evidence was obtained through investigatory efforts that would, if revealed, show the FBI's investigative focus, leading to the harms detailed above.

c.  On the page Bates-numbered FBI 22-cv-1921-434, which contains an email discussing the content of the draft affidavit referred to above.

d.  On seven pages of email communications (Bates-numbered FBI 22-cv-1921-543-549), which were withheld in full because they contain exclusively a discussion of personnel staffed on the Mar-a-Lago investigation.  If disclosed, this information would risk revealing a connection between those personnel and the investigative focuses of the Mar-a-Lago investigation.

<u>(b)(7)(E)-6: Types and Timing of Investigations</u>

136.    In Exemption category (b)(7)(E)-6, the FBI protected information pertaining to the types and timing of investigations referenced in the records at issue in this case. Specifically, some of the information withheld, when referenced in connection with actual investigation and not in general discussion, pertains to the type of investigation, whether it is a "preliminary" or "full" investigation and the dates the FBI initiated the investigations. Disclosure of this information would inform criminals the types of activities that would trigger a full investigation as opposed to a preliminary investigation, and the particular dates the investigations cover. Additionally, this information would also give criminals valuable insight into how the FBI develops its investigations. Release of this information would allow investigative subjects to predict FBI investigative strategies and adjust their behavior accordingly. Moreover, revealing a specific activity in general warrants investigation could likewise cause individuals to adjust their conduct to avoid investigative scrutiny by the FBI. Therefore, the FBI has properly withheld this

information pursuant to Exemption 7(E).

137.    Information protected by Exemption category (b)(7)(E)-6 appears in the following locations:

    a.  In the draft affidavit in support of a search warrant application, on the pages Bates-numbered FBI 22-cv-1921-509-512, FBI 22-cv-1921-514-517, and FBI 22-cv-1921-524. The relevant material discusses the prosecution's evidence of probable cause to search the premises in question. That evidence was obtained through investigatory efforts that would, if revealed, show the types and timing of FBI's investigation, leading to the harms detailed above.

    b.  In the draft court filing proposing redactions of the affidavit described above, on the pages Bates-numbered FBI 22-cv-1921-631 and FBI 22-cv-1921-635. The relevant material discusses the prosecution's evidence of probable cause to search the premises in question. That evidence was obtained through investigatory efforts that would, if revealed, show the types and timing of FBI's investigation, leading to the harms detailed above.

    c.  In the draft talking points prepared by FBI OCA for the Deputy Director's anticipated meeting with the congressional Gang of Eight, on the page Bates-numbered FBI 22-cv-1921-676. The redacted information appears amid a discussion of intelligence sources and methods. If revealed, that information would reveal the types and timing of investigative measures that have been employed in the ongoing Mar-a-Lago investigation.

    d.  On the page Bates-numbered FBI 22-cv-1921-434, which contains an email

discussing the content of the draft affidavit referred to above

Foreseeable Harm Standard

138.    The FOIA Improvement Act of 2016 generally adopted the foreseeable harm standard and made it statutory, advising that agencies shall withhold information under the FOIA only if the agency reasonably foresees that disclosure would harm an interest protected by an exemption or disclosure is prohibited by law. Accordingly, the FBI's analysis of records responsive under the FOIA is a two-part process. First, the FBI determines whether a portion of a record is exempt pursuant to one or more FOIA exemptions. Second, if the portion of the record is exempt pursuant to one or more FOIA exemptions, the FBI then considers whether foreseeable harm would result from disclosure of the portion thereof. For the portions of withheld records at issue here, the FBI conducted this two-part analysis and only withheld portions of records where it determined the withheld portions met both of these criteria. The FBI's foreseeable harm is more fully described within each of the above coded exemption justification categories.[25]

CONSULTATIONS WITH OTHER GOVERNMENT AGENCIES

*Department of Justice, Office of Information Policy*

139.    The FBI consulted with OIP concerning twenty-two (22) documents[26] (consisting of 113 pages) of records. OIP requested the FBI assert Exemption (b)(5) to withhold information on sixty-five (65) of those pages Bates-numbered FBI 22-cv-1921-324, 330-331, 503-528, 550, 553, 555-556, 558, 560-562, 565, 568, 572-573, 577, 581, 587, 592, 597-598, 603, 607, 612-613,

---

[25] 5 U.S.C. § 552(a)(8)(A)(i)(II) does not impose a requirement to articulate harm for Exemption (b)(3).

[26] The twenty-two (22) documents are Bates-numbered FBI 22-cv-1921-324, 330-331, 502-528, 550-551, 552-553, 554-556, 557-559, 560-562, 563-565, 566-569, 570-573, 574-577, 578-581, 582-588. 589-593, 594-598, 599-603, 604-608, 609-613, 614-618, 626 and 627-639.

618, 626, and 637-639 on their behalf. Additional information concerning OIP's justification for withholding is contained in the Declaration of Vanessa R. Brinkmann.

*SEGREGABILITY*

140.    As discussed in ¶ 4 *supra*, the FBI reviewed a total of 683 responsive pages. Of those 683 pages,499 pages were Released in Full (RIF), 120 pages were Released in Part (RIP), and 64 pages were Withheld in Full (WIF). Of the 683 reviewed pages, Plaintiff challenged exemptions on 51 documents, equating to 295 pages. Of these challenged set of pages, the FBI RIF 120 pages, RIP 111 pages, WIF pursuant to FOIA exemptions 56 pages and WIF 8 pages as duplicate to other pages. Each of these categories is discussed below to further address the segregability of the challenged pages.

   a.    Pages RIF. Following its segregability review, RIDS determined 120 pages could be released in full without redaction as there was no foreseeable harm to an interest protected by a FOIA exemption.

   b.    Pages RIP. Following its segregability review, RIDS determined 111 pages could be released in part with redactions per the identified FOIA exemptions herein. These pages comprise a mixture of material that could be segregated for release and material that was withheld as release would trigger foreseeable harm to one or more interests protected by the cited FOIA exemptions on these pages.

   c.    Pages WIF. Following its segregability review, RIDS determined 64 pages required withholding in their entirety. RIDS determined that either some pages were duplicate to other pages, or all information on these pages was either fully covered by one or more of the cited FOIA exemptions, or determined that any non-exempt information on these pages was so intertwined with exempt material, no information could be reasonably segregated for release. Any further

segregation of this intertwined material would employ finite resources only to

produce disjointed words, phrases, or sentences, that taken separately or together,

would have minimal or no informational content.

## PART IV:  JUSTIFICATION FOR CATEGORICAL WITHHOLDING OF INFORMATION PURSUANT TO EXEMPTION 7(A)

*EXEMPTION 7 THRESHOLD*

141.    Before an agency can invoke any of the harms enumerated in Exemption (b)(7), it

must first demonstrate that the records or information at issue were compiled for law

enforcement purposes. Pursuant to 28 U.S.C. §§ 533 and 534, Executive Order 12,333 as

implemented by the Attorney General's Guidelines for Domestic FBI Operations (AGG-DOM),

and 28 C.F.R. § 0.85, the FBI is the primary investigative agency of the federal government with

authority and responsibility to investigate all violations of federal law not exclusively assigned to

another agency, to conduct investigations and activities to protect the United States and its

people from terrorism and threats to the national security, and to further the foreign intelligence

objectives of the United States. Under this investigative authority, the responsive records herein

were compiled for the following law enforcement purposes.

142.    The records at issue were created and compiled in furtherance of the FBI's role in

an active criminal investigation concerning the potential improper removal and storage of

classified information in unauthorized spaces, as well as the potential unlawful concealment or

removal of government records. Thus, the FBI determined they were created and compiled for a

law enforcement purpose.

*PENDING LAW ENFORCEMENT PROCEEDING AT ISSUE*

143.    As discussed in submissions before the United States District Court for the

Southern District of Florida, *see In Re Sealed Search Warrant*, Case No. 22-MJ-8332 (S.D. Fla.), the FBI has an active criminal investigation concerning the potential improper removal and storage of classified information in unauthorized spaces, as well as the potential unlawful concealment or removal of government records. Based on information provided by Special Counsel (SC) Jack Smith's office, as well as information known to the FBI, the investigation and prosecution being led by SC Jack Smith in *United States v. Trump, et al.,* No. 23-cr-80101 (S.D. Fla.) is ongoing, and disclosure of any of the records at issue is reasonably expected to harm the pending prosecution brought by SC Jack Smith. Accordingly, the FBI, in consultation with Special Counsel Smith's office, coordinated its responses to Plaintiff's request to ensure that the integrity of the investigation and ongoing enforcement proceedings were appropriately protected.

REASONABLE EXPECTATION OF INTERFERENCE

144.    The application of Exemption 7(A) in litigation involves a three-part process requiring the FBI to review each document withheld on a document-by-document basis; to group the documents into functional categories and to describe the categories; and to explain why release of documents in each category would interfere with pending or prospective law enforcement proceedings. The FBI conducted a document-by-document review of records responsive to Plaintiff's FOIA request maintained in the pending investigative file to determine the applicability of Exemption 7(A) and has grouped the responsive documents into functional categories. The following paragraphs describe the functional categories and explain why release of responsive documents from the investigative file would interfere with prospective law enforcement proceedings.

145.    The FBI's review of the responsive records in this case revealed no material responsive to Plaintiff's FOIA request from the pending file that can be released without interfering with ongoing investigation and/or prosecutive efforts. Additionally, the review

concluded that none of the responsive material in the investigative file was in the public domain.

146.    Any release of information from the pending file to Plaintiff would be premature and likely to cause harm. Release of the investigative records at issue, would, in general terms, reveal non-public details about the scope of the pending FBI investigative efforts, and would allow targeted individuals, witnesses or subjects of the ongoing investigation to know details about the investigation that would not otherwise be available to them. Specifically, given the high-profile nature of this investigation, this could allow potential witnesses or subjects to locate specific details related to the ongoing investigation and use this information to influence the investigation by altering witness testimony or tampering with or destroying relevant evidence. These individuals could therefore use the released information to their advantage to destroy evidence, intimidate potential witnesses, and/or evade the FBI's investigative efforts in relation to reasonably anticipated further proceedings. In this regard, release of information contained in the responsive documents would cause, in general terms, the following potential harms:

> a.  The identification of individuals, sources, and potential witnesses who possess information related to the investigation and possible harm to, or intimidation of such individuals;
>
> b.  The use of released information to inappropriately counteract evidence developed by investigators, to alter or destroy potential evidence, or to create false evidence;
>
> c.  The use of information released to uncover the government's prosecution strategy; and
>
> d.  The use of released information by any subject of the investigation to assess the likelihood that he or she may be prosecuted and/or

convicted in connection with this investigation.

147.    Furthermore, the release of this information could allow other third parties to interfere with the pending prosecution by providing them the means to harass/intimidate witnesses, investigators and prosecutors, and/or allow them the opportunity to create false evidence or corrupt valuable evidence, calling into question the validity of facts gathered during FBI investigations. This is because once a release is made to Plaintiff under the FOIA, Plaintiff's use and dissemination of the information to third parties is unrestricted.

*Types of Law Enforcement Records*

148.    Providing a document-by-document description or listing of the records responsive to Plaintiff's request falling in the categorically denied records would undermine the very interests that the FBI seeks to protect under Exemption (b)(7)(A). In order to protect these interests, the FBI has described the types of responsive records from the pending investigative file, which are being withheld in full pursuant to FOIA Exemption (b)(7)(A). The pending investigative files contain the following types of records:

a.    FD-1036 (Import Forms):  These forms are used to describe documents and materials imported into the investigative case within the Sentinel system.

b.    Form FD-1057 and Electronic Communications ("ECs"):  FD-1057s and ECs replaced the traditional FBI correspondence (*i.e.,* Memoranda and Letters) as the primary vehicle of correspondence within the FBI. The purpose of an EC is to communicate within the FBI in a consistent format that can be uploaded by the originating Division or office, transmitted, and downloaded by recipient Divisions or offices within the FBI's internal computer network. These forms are often utilized to record and disseminate

intelligence/investigative information and for general investigation administration purposes.

c. <u>Interview Forms (FD-302) and Notes:</u>  FD-302s and interview notes document FBI interviews. Such evidence and/or interview information may later be used as testimony or evidence in court proceedings/trials. Additionally, these evidence/interview forms are often incorporated in other FBI documents which disseminate intelligence/investigative information and can be utilized to set leads in furtherance of the FBI's investigative efforts. Handwritten interview notes of FBI personnel who conducted interviews in the course of FBI investigations are typically transposed into FD-302s and are utilized by the FBI in the same manner.

d. <u>Emails:</u> These documents consist of electronic communications exchanged between and among FBI Special Agents, other FBI employees and personnel in other government agencies, divisions, squads, and/or units, concerning the investigation.

e. <u>FD-1087 (Evidence Log):</u>  This form is used to keep track of evidence within an investigation.

f. <u>Letterhead Memorandum (LHM):</u>  This memorandum is an interim summary that reports information, usually derived from FD-302s, concerning the subject of an investigation. It is designed to alert other field offices and/or FBI Headquarters about pertinent developments in an investigation. Usually, an LHM is attached to a cover sheet, which is typically an FBI letter. The LHM can also be detached from the cover sheet and disseminated to other Government agencies, as a "Law Enforcement Sensitive/For Official Use Only" document.

g. <u>Third-Party Information</u>:  Documents or information received from third-parties who provided investigative information to the FBI.

h. <u>Other Foreign, Federal, State, and/or Local Law Enforcement Documents:</u> Documents provided to the FBI by foreign, federal, state, and/or local law enforcement agencies. These documents can be used as evidence in court proceedings, are often incorporated in other FBI documents that may be used to disseminate intelligence/investigative information, and can be utilized to set leads in furtherance of the FBI's investigative efforts.

i. <u>Other Investigative Documents Utilized for Investigative Purposes:</u>  These are various types of documents reflecting information and evidence gathered during an FBI investigation, the sources from/by which such information and evidence was gathered, methods used to obtain the information and evidence, and methods used to analyze the information and evidence. To describe these investigative documents in this category any more specifically would reveal the scope of the FBI's investigations, as well as the sources and methods being utilized by the FBI.

*Functional Categories of Information*

149.    The FBI has reviewed and grouped the responsive records into functional categories for purposes of demonstrating why the information is exempt from disclosure under FOIA Exemption 7(A). Each responsive document that was withheld falls into one or more of the functional categories described in the following paragraphs. For example, one document may serve several purposes and may contain multiple categories of information, such as witness statements, administrative directions, or evidentiary materials. These documents could, therefore, be included in multiple categories as could the information contained within the documents. Here the functional categories include:

150.    <u>Evidentiary/Investigative Materials:</u>  In general, this category includes evidence, copies of evidence, and derivative communications discussing or incorporating evidence. A

derivative communication describes, verbatim or in summary, the contents of the original record, how it was obtained, and how it relates to the investigation. Other derivative communications report this information to other FBI Field Offices or other law enforcement agencies, either to advise them of the progress of the investigation, or to elicit their assistance in handling investigative leads. This category also includes records generally related to the FBI's conduct of the relevant investigation, as described in further detail below. The following paragraphs describe the types of evidentiary material in the responsive records and the anticipated harm that could reasonably result from the release of such material.

    a. <u>Information Concerning Physical and Documentary Evidence</u>: The category of physical and documentary evidence in the investigative file may include records obtained through, and/or summarizing information gathered through, searches, seizures, surveillance, confidential source/witness interviews, Federal Grand Jury subpoenas, and other law enforcement/intelligence gathering activities. This category also includes derivative communications, which describe (verbatim or in summary) the original evidence. To more fully describe these records could reasonably lead to disclosure of the nature of the pending investigative efforts/programs to which these records pertain. Such a disclosure could be detrimental to success of the pending and prospective enforcement proceedings by permitting subjects to estimate the scope of the FBI's investigation and judge whether their activities are likely to be detected or likely to be considered for further prosecutive action; allowing investigative subjects to discern the FBI's investigative strategies and employ countermeasures to avoid detection and disruption by law enforcement; and allowing investigative targets to formulate

strategies to contradict evidence to be presented in court proceedings.

b.  <u>Investigative Information</u>:  This category includes records of law enforcement methods or procedures undertaken in furtherance of the investigation, to include requests for authority to engage in various investigatory activities or employ particular methods or procedures; the results of such activities, methods, or procedures; and the collection, analysis, and dissemination of information obtained through utilization of these activities, methods, or procedures.  If records containing this information were released, it would give criminals and their associates valuable insight into the FBI's investigative methods, allowing them to evade those methods (in this case and in others). It would also enable subjects to see how the FBI has applied its investigative methods in this case, creating the potential for evasion of those methods in the future (and corresponding damage to FBI's investigatory abilities).

c.  <u>Exchange of Information between the FBI and Various Other Federal Agencies</u>: Release of records documenting and detailing the exchange of information among outside agencies will disclose investigative information developed by various agencies that have cooperated with and provided information and records to the FBI in a pending investigation, as well as evidence, intelligence, investigative information, and law enforcement methods and procedures utilized in this investigation. This information was gathered to help identify subjects, suspects, or other individuals of potential investigative interest and to assist in locating witnesses and/or confidential sources. Inherent in this cooperative effort is the mutual understanding that information provided to the FBI by those agencies will

not be prematurely released. Were it to be prematurely released, FBI's cooperation (on which it vitally depends) with other agencies would be impeded. Moreover, release of this information would identify the investigative interest in particular individuals, reveal the scope and focus of the investigation, and subject witnesses and confidential sources to potential harassment, intimidation and physical and mental harm.

151.    Administrative Materials:  Materials that fall into this category include items such as case captions, serial numbers, identities of FBI field offices involved, dates of investigation, and detailed instructions designed to ensure that investigative procedures are conducted within the appropriate FBI and DOJ guidelines. The following paragraphs describe the types of administrative materials at issue and the anticipated harm that could reasonably result from the release of such materials. In many instances, administrative information is contained in correspondence or documents that also fall into other categories. Therefore, release of details with respect to this category of information would also reveal the investigative interests of the FBI and could enable suspects to discern non-public information akin to a "road map" of the investigation.

a.    Reporting Communications: These communications, between the FBI headquarters, field offices, and other agencies, permit the FBI and/or other agencies to monitor the progress of the investigation and to facilitate its conduct. These communications may reveal or confirm the cooperation of other local, state or federal agencies in the investigation. They are replete with detailed, non-public information about the investigative activities as well as detailed information about potential witnesses and confidential sources to be interviewed. Additionally, they

contain background information about third-party individuals, the origin of

pertinent information that ties them to the investigation, their connection with the

subjects, and their relationship with a pending investigation. The release of this

information would further reveal the nature and scope of the investigation that is

pending due to the reasonably anticipated further proceedings.

b. <u>Administrative Instructions</u>:  This type of information, whether it originates in

communications from DOJ, the FBI, or other domestic or foreign law

enforcement agencies, if released to a knowledgeable person, would disclose

specific investigative procedures and strategies employed in this investigation.

Such administrative instructions and information have the potential to reveal or

confirm the use or contemplated use of particular law enforcement techniques and

procedures, the effectiveness of those techniques and procedures; and guidelines

or instructions for their use; the cooperation of OGAs/law enforcement agencies

in the investigation; the identities of sources, witnesses, targets, and other

individuals of potential investigative interest; the focus, scope, and anticipated

trajectory of the investigation; any potential or perceived challenges in the

investigation; and requests for specific investigative inquiries and affirmative

taskings to various FBI field offices or to other government or law enforcement

agencies (i.e., investigative leads).  Release of this information would thus permit

the subjects of these investigations (in this case and in others) to anticipate and

possibly alter or negate incriminating evidence which could be used in future

proceedings/investigative efforts, as well as creating the potential to expose actual

and anticipated witnesses and sources, and to arm adversaries with information

necessary to avoid particular techniques and procedures, develop

countermeasures, and destroy or fabricate evidence. Specific examples of these

instructions include the setting out of investigative guidelines and requests for

specific investigative inquiries at various FBI field offices or other government

agencies. These instructions are commonly referred to as "investigative leads"

and are set forth throughout the course of the FBI investigations.

**PART V:  7(A) GLOMAR RESPONSE TO ITEM No. 6 OF PLAINTIFF'S REQUEST**

152.    The FBI relies on *Glomar* responses in instances which, assuming that responsive

records existed, even acknowledging their existence or nonexistence would result in harms

protected against by one or more FOIA exemptions. To be credible and effective, the FBI must

use the *Glomar* response in all similar cases regardless of whether responsive records exist,

including in instances in which the FBI does not possess any records responsive to a particular

request. If the FBI were to issue a *Glomar* response only when it actually possessed responsive

records, the *Glomar* response would itself be interpreted as an admission that responsive records

exist.

153.    The FBI is issuing a Glomar response neither confirming nor denying the

existence of records responsive to Item No. 6 of Plaintiff's request seeking records referring to or

mentioning Presidential records from the Trump White House that were destroyed and were

allegedly flushed down the toilet. Plaintiff request's may be based on various news outlets'

reporting, but is not substantiated by any official public statements or disclosures by the FBI

acknowledging the existence or non-existence of responsive records.  Although the existence of

an FBI investigation about former President Trump's handling of classified records has been

publicly acknowledged, the FBI has not disclosed or acknowledged any aspect of the

investigation pertaining to this particular matter. The FBI has determined that merely

acknowledging the existence or non-existence of records responsive would require the FBI to confirm or refute those allegations, hence triggering harm under FOIA Exemption (b)(7)(A).

154.    Assuming the FBI has responsive records, acknowledging its existence prematurely could reasonably be expected to hamper prosecutorial efforts by exposing potential witness or sources to harassment, intimidation, coercion, physical threats or actual harm. Conversely, assuming the FBI does not have responsive records, such acknowledgment would also trigger harm by revealing the lack of focus on specific aspects of the investigations or undetected criminal activity.  This would allow potential targets the opportunity to take defensive measure to elude detection and suppress, destroyed, alter or fabricate evidence.  Therefore, the FBI in consultation with Special Counsel Smith's office, determined that merely acknowledging the existence or non-existence of records responsive to Item No. 6 of Plaintiff's request reasonably could be expected to interfere with its ongoing investigation, triggering the harm against which FOIA Exemption (b)(7)(A) protects as detailed above.

*APPLICABILITY OF EXEMPTION (B)(7)(A)*

*Exemption (b)(7) Threshold*

155.    As previously discussed, before an agency can invoke any of the harms enumerated in Exemption (b)(7), it must first demonstrate that the records or information at issue were compiled for law enforcement purposes. As explained above, the FBI is the primary investigative agency of the federal government with authority and responsibility to investigate all violations of federal law not exclusively assigned to another agency, to conduct investigations and activities to protect the United States and its people from terrorism and threats to national security, and to further the foreign intelligence objectives of the United States.

156.    Plaintiff's request seeks all records referring to or mentioning Presidential Records from the Trump White House that were destroyed and were allegedly flushed down the

toilet.

157.    Assuming the existence of the records requested by Plaintiff, such records would be part of the ongoing criminal investigation concerning the potential improper removal and storage of classified information in unauthorized spaces, as well as the potential unlawful concealment or removal of government records. That investigation is within the law enforcement duties of the FBI, and therefore, any records compiled as part of that investigation would be compiled for law enforcement purposes.

*Exemption (b)(7)(A)* Glomar

158.    FOIA Exemption (b)(7)(A) protects "records or information compiled for law enforcement purposes [when disclosure] could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A).

159.    In addition to satisfying Exemption (b)(7)'s threshold, an agency must establish that (a) there is a pending or prospective law enforcement proceeding and (b) disclosure of responsive records could reasonably be expected to adversely affect it.

160.    As explained above, all records referring to or mentioning Presidential Records from the Trump White House that were destroyed and were allegedly flushed down the toilet, if they were to exist, would relate to the FBI's ongoing investigation described above. While the FBI's investigation into this matter has been officially acknowledged, the existence or non-existence of the requested records has not been officially acknowledged.

161.    If the FBI disclosed the existence or nonexistence of records responsive to Item No. 6 of Plaintiff's request at this stage of the FBI's investigation, such a disclosure could reasonably be expected to hamper and interfere with the pending investigation. This is because confirmation or denial of such records would disclose facts gathered during the course of the pending investigation that might lead persons of interest to alter their testimony; destroy,

71

adulterate, or fabricate evidence; or refuse to cooperate with the government altogether. Any testimony gathered after the disclosure could thus be tainted, since each person the FBI interviewed thereafter would have the opportunity to mold his or her statements in light of the prematurely disclosed evidence. More than that, confirmation or denial of the existence or non-existence of responsive records would provide those intent on interfering with the investigation additional pieces of information necessary to target their behaviors to maximize the effect of any efforts to undermine the investigation. This, in turn, reasonably could be expected to severely hamper the FBI's ability to investigate and assist in the prosecution of potential crimes.

162.    Therefore, the FBI properly refused to confirm or deny the existence of records responsive to Item No. 6 of Plaintiff's request pursuant to FOIA Exemption (b)(7)(A).

## CONCLUSION

163.    The FBI performed adequate and reasonable searches for responsive records, and released all reasonably segregable non-exempt information from documents responsive to Plaintiff's FOIA request that are subject to the FOIA.  Information was properly withheld pursuant to FOIA Exemptions 1, 3, 5, 7(A) and 7(E). The FBI carefully examined the documents and determined the information withheld from Plaintiff in this case, if disclosed, would reveal classified information; would reveal statutorily protected information; would reveal privileged information; could reasonably be expected to interfere with pending or prospective enforcement proceedings; and would disclose techniques and procedures for law enforcement investigations. After extensive review of the documents at issue, the FBI determined there is no further non-exempt information that can be reasonably segregated and released without revealing exempt information.

164.    The FBI further properly denied access to records responsive to Plaintiff's request as releasing any of this information would present harms protected against by FOIA Exemption

7(A). Specifically, the FBI determined release of any of this information would endanger a pending law enforcement proceeding and the disclosure of the responsive records from that pending investigative file, at this time, could reasonably be expected to adversely affect the investigation and any resulting prosecutions; thus, the records are exempt from disclosure pursuant to FOIA Exemption (b)(7)(A).

165.    Finally, the FBI can neither confirm nor deny the existence of any records responsive to Item 6 of Plaintiff's request pursuant to FOIA Exemption 7(A) [5 U.S.C. § 552 (b)(7)(A)]. The mere acknowledgement of the existence or nonexistence of such records would interfere with the pending law enforcement investigation and would harm the interests protected by FOIA Exemption (b)(7)(A).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and that Exhibits A - O attached hereto are true and correct copies.

Executed this __23__ day of August 2024.


SHANNON R. HAMMER
Acting Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia