### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

JASON LEOPOLD,

          Plaintiff,

       v.

FEDERAL BUREAU OF INVESTIGATION,
*et al.*,

          Defendants.

Civil Action No. 22-1921 (BAH)

Judge Beryl A. Howell

### <u>MEMORANDUM OPINION</u>

Despite filling nearly 400 pages, including exhibits and declarations, briefing in this case fell behind developments in the real world that carry fatal consequences for the agency's proffered rationale for withholding records responsive to a request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*  Absent correct application of an exemption, disclosure is required to allow the American people to learn about actions of government officials that the officials themselves may not otherwise want to be made public.  As the D.C. Circuit has long made clear: "One basic general assumption of the FOIA is that, in many important public matters, it is for the public to know and then to judge."  *Stern v. FBI*, 737 F.2d 84, 94 (D.C. Cir. 1984).

The FOIA request at issue in this lawsuit was filed by plaintiff Jason Leopold with the Federal Bureau of Investigation ("FBI"), on February 22, 2022, following published reports that President Donald Trump ("President Trump") allegedly flushed some presidential records down the toilet when he was still in the White House and brought presidential records, including sensitive classified documents, to his personal residence in Florida.  Pl.'s Statement of Undisputed Material Fact ("Pl.'s SUMF") ¶¶ 1-5, 10, ECF No. 34-2; Pl.'s Reply Supp. Cross-

Mot. Summ. J. ("Pl.'s Reply") at 6, ECF No. 40 (noting "[t]he request was plainly targeting" records "that President Trump had allegedly flushed records down the White House toilet"). Presidential records are those "documentary materials, or any reasonably segregable portions thereof, created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." 44 U.S.C. § 2201(2). These records belong to the "United States," *see* 42 U.S.C. § 2202, not any individual office holder, and are to be handled in accordance with the provisions found in 42 U.S.C. § 2201 *et seq.*

Plaintiff requested five categories of information related to "Presidential Records removed from the Trump White House that were stored at Mar-a-Lago" and an additional category of information related to "Presidential Records from the Trump White House that were destroyed and Presidential Records from the Trump White House that were allegedly flushed down the toilet" ("sixth category" or "Item No. 6"). Defs.' Statement of Undisputed Material Facts ("Defs.' SUMF") ¶ 1, ECF No. 31-2.[1] Shortly after receipt of the FOIA request, the FBI issued, on March 11, 2022, a *Glomar* response refusing to confirm or deny the existence of responsive records because no investigation into the mishandling of presidential records had been officially acknowledged. *Id.* at ¶ 2.[2] Plaintiff timely instituted this action, after

---

[1]    Unless otherwise noted, the parties' submitted facts are not disputed.

[2]    The phrase "*Glomar*" stems from a case in which a FOIA requester sought information concerning a ship named the "*Hughes Glomar Explorer*," and the CIA refused to confirm or deny its relationship with the Glomar vessel because to do so would compromise the national security or divulge intelligence sources and methods. *Phillippi v. CIA*, 655 F.2d 1325, 1329-31 (D.C. Cir. 1981). The D.C. Circuit upheld that decision, *see id.* at 1333, and now *Glomar* responses are proper "if the fact of the existence or nonexistence of agency records falls within a FOIA exemption." *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007); *see also* Part.III.A.

administratively exhausting his claims, against the FBI and the United States Department of Justice ("DOJ") (collectively "defendants") to challenge the FBI's *Glomar* response.  *See generally* Compl., ECF No. 1.

Four months after the filing of this suit, the FBI, on November 22, 2022, reopened its response to plaintiff's FOIA request because the Attorney General of the United States officially acknowledged an investigation into the possible mishandling of confidential documents.  *See* Defs.' Mem. Supp. Mot. Summ. J. ("Defs.' Mem.") at 5-7, ECF No. 31-1; Pl.'s SUMF ¶ 15; Defs.' SUMF ¶ 6.  Specifically, as to the first five categories of requested information, the FBI lifted its *Glomar* response, searched for responsive records in its Centralized Records System ("CRS") and in email accounts, processed portions of the records that fell outside what the FBI calls its "Mar-a-Lago investigative file," *see* Defs.' Mem., Decl. of Shannon R. Hammer, Asst. Section Chief of the Record/Info. Dissemination Section, FBI ("Hammer Decl.") ¶ 37, ECF No. 31-6, and released 499 pages of records in full and 120 pages in part to plaintiff, Hammer Decl. ¶ 4, Defs.' SUMF ¶¶ 6-7, 19-21.  Relying on FOIA's Exemption 7(A), 5 U.S.C. § 522(b)(7)(A), the FBI withheld categorically all records responsive to categories one through five that fell within the Mar-a-Lago investigative file, Defs.' SUMF ¶¶ 19-21, 46-47, and, in contrast to its response to the first five categories of requested information, the FBI maintained the *Glomar* response as to the sixth category of requested information and did not search for any responsive records that may or may not exist, *see* Hammer Decl. ¶¶ 152-154, Defs.' Mem. at 13.

The parties' dispute, in the pending cross-motions for summary judgment, focuses on the FBI's categorical reliance on Exemption 7(A), to decline to release from the Mar-a-Lago investigative file records responsive to the first five categories in the FOIA request, as well as the propriety of offering a *Glomar* response to requested information in the sixth category together

with the refusal to conduct a search for records.  *See* Defs.' Mot. Summ. J. ("Defs.' MSJ") at 1,

ECF No. 31, Defs.' Mem. at 1-3; Pl.'s Cross-Mot. Summ. J. ("Pl.'s XMSJ") at 1, ECF No. 34;

Pl.'s Mem. Supp. XMSJ & Opp'n Defs.' MSJ ("Pl.'s Opp'n") at 1-3, ECF No. 34-1.[3]  Given the

current circumstances and legal landscape—including that President Trump now enjoys absolute

and presumptive immunity from criminal liability, the government has dismissed criminal

charges against President Trump and has dropped its challenge to the district court's order

dismissing the criminal charges against his co-defendants for alleged mishandling of classified

presidential records, and no pending or even contemplated criminal enforcement action within

the applicable statute of limitations on the topics of responsive records is at all likely—the FBI's

reliance on Exemption 7(A) and a *Glomar* response predicated on this exemption, is neither a

proper nor a sufficient response to the FOIA request at issue.

Consequently, for the reasons explained in more detail below, defendants' motion for

summary judgment as to application of Exemption 7(A) to withhold responsive records

contained in the Mar-a-Lago investigative file and to rely on a *Glomar* response to the sixth

category of requested information, is denied, and plaintiff's cross motion for summary judgment

on these two legal issues is granted.

## I.    BACKGROUND

The relevant factual background and procedural history is described below.

---

[3]    The memoranda filed in support of many of these motions are docketed twice and, to simplify citation, only one of the duplicate memoranda is cited.  For example, the plaintiff's memorandum in support of its cross-motion for summary judgment and opposition to defendant's motion for summary judgment is docketed twice, at ECF Nos. 34 and 35; only the memorandum at ECF No. 34 is cited.  Defendants' memorandum in support of the motion for summary judgment and in opposition to plaintiff's cross-motion are docketed at ECF Nos. 38 and 39, and only the memorandum at ECF No. 38 is cited.

### A.    Factual Background

On February 10, 2022, Axios, a news website, reported on a then-upcoming book written by Maggie Haberman, a *New York Times* White House correspondent, which book contained a claim that President Trump flushed presidential records down the toilet at the White House.  Pl.'s SUMF ¶ 1.[4]  Roughly a week later, on February 18, 2022, a letter from the Archivist of the United States to Congress publicly described that President Trump had allegedly brought presidential records, some of which were classified, to his personal residence at Mar-a-Lago after he lost the 2020 presidential election and left the White House.  *Id.* ¶ 4.  The letter continued that President Trump had eventually delivered some of those records to the National Archives but not all of them, *see id.* ¶ 5, resulting in the FBI searching Mar-a-Lago on August 8, 2022, pursuant to a duly authorized search warrant, which was supported by a judicial finding that probable cause existed that evidence of crimes would be found there.  *See* Pl.'s SUMF ¶ 6; Notice of Filing Redacted Documents at 3-4, *In re Sealed Search Warrant*, No. 22-mj-8832 (S.D. Fla. Aug. 11, 2022), United States' Resp. Mot. Jud. Oversight & Add'l Relief ("U.S. Resp. Mot. Jud. Oversight") at 12, *Trump v. United States*, No. 22-cv-81294 (S.D. Fla. Aug. 30, 2022).[5]  Indeed, during the execution of the search warrant, the FBI seized thirty-three boxes, containers, or items of evidence, holding over a hundred classified records, including information classified at the highest levels.  U.S. Resp. Mot. Jud. Oversight at 12.

The Attorney General, on November 18, 2022, acknowledged the FBI's investigation into the alleged mishandling of classified documents and appointed Special Counsel Jack Smith

---

[4]    In August of 2022, Haberman released photos of notes at the bottom of two toilets, and, according to her sources, one photo was allegedly of a White House toilet while the other toilet was overseas.  Pl.'s SUMF ¶ 2.

[5]    The parties cite to these court filings in separate proceedings and this Court "may take judicial notice of another court's proceedings."  *Jurdi v. United States*, 485 F. Supp. 3d 83, 89 n.2 (D.D.C. 2020) (quoting *Donelson v. U.S. Bureau of Prisons*, 82 F. Supp. 3d 367, 371 (D.D.C. 2015)).

("Special Counsel Smith") to oversee the investigation. Defs.' Mem. at 5 (citing *Appointment of a Special Counsel*, U.S. DEP'T OF JUSTICE OFF. PUB. AFFS. (Nov. 18, 2022), https://perma.cc/8CXM-HWQL); Pl.'s SUMF ¶ 7. That investigation resulted in a grand jury in the Southern District of Florida returning an indictment charging President Trump with 37 federal felony charges and his personal aide Waltine Nauta ("Nauta") with six federal felony charges arising from the alleged mishandling of classified documents. Pl.'s SUMF ¶¶ 6-7; Indictment, *United States v. Trump*, No. 23-cr-80101 (S.D. Fla. June 8, 2023), ECF No. 3. A grand jury in the same district subsequently returned, on July 27, 2023, a superseding indictment, charging President Trump and Nauta with additional felony counts and adding a third defendant, Carlos de Oliveira ("Oliveira"), who was the Mar-a-Lago property manager. Pl.'s SUMF ¶ 8; Superseding Indictment, *United States v. Trump*, No. 23-cr-80101 (S.D. Fla. July 27, 2023), ECF No. 85. One year later, on July 15, 2024, the Southern District of Florida judge presiding over the criminal matter against President Trump and his co-defendants granted the defendants' motion to dismiss the indictment, Pl.'s SUMF ¶ 9, *United States v. Trump*, No. 23-cr-80101, 2024 WL 3404555, at *1 (S.D. Fla. July 15, 2024), and the Special Counsel noticed an appeal of that decision to the United States Court of Appeals for the Eleventh Circuit, Pl.'s SUMF ¶ 9.

After briefing in this case ripened, however, all federal charges against President Trump were dismissed. *See* Order of Dismissal, No. 24-12311 (11th Cir. Nov. 26, 2024), Doc. No. 81-2. The government is also seeking dismissal with prejudice of the appeal of the district court's dismissal of the charges against President Trump's co-defendants. *See* Unopposed Gov't Mot. to Dismiss, No. 24-12311 (11th Cir. Jan. 29, 2025), Doc. No. 111.[6] Special Counsel Smith's

---

[6]    The government's unopposed motion to dismiss the appeal with prejudice as to Nauta and Oliveira is not yet resolved by the Eleventh Circuit, but nonetheless indicates a clear government intention to cease challenging the district court's dismissal of the indictment against them. *See Mapother v. Dep't of Justice*, 3 F.3d 1533, 1540 (D.C. Cir. 1991) ("[W]e have held that [Exemption 7(A)] is available where enforcement proceedings

investigation has now concluded.  *See* Letter from Jack Smith, Special Couns., to Merrick B.

Garland, Att'y Gen. of the U.S. ("Special Counsel Smith's Ltr.") at 4 (Jan. 7, 2025),

https://perma.cc/URD5-GZFL ("With this Report, my service and the service of my staff is

complete.").

### B.    Plaintiff's FOIA Request and the Instant Litigation

After the February 2022 reporting of the alleged flushing of presidential records down the

toilet at the White House and the Archivist's letter publicly describing President Trump's alleged

mishandling of classified documents at Mar-a-Lago, plaintiff filed the FOIA request at issue

seeking:

1.  All records, such as emails, memos, letters, text messages, reports, mentioning or referring to Presidential Records removed from the Trump White House that were stored at Mar-a-Lago. For this part of the request please search the offices of the Director, Deputy Director, National Security Branch, Intelligence Branch, Criminal, Cyber, Response, and Services Branch and Counterintelligence and Foreign Counterintelligence offices;
2.  All records, such as emails, memos, text messages, letters, reports, personnel in the offices listed in part 1 exchanged with the National Archives, Department of Justice, CIA, Defense Intelligence Agency, NSA, DOD and the State Department mentioning or referring to boxes of Presidential Records removed from the Trump White House that were stored at Mar-a-Lago; classified information and boxes of Presidential Records from the Trump White House that were stored at Mar-a-Lago. Please search the same offices listed in part 1 for responsive records;
3.  Any and all damage assessments, specifically reports documenting damage to national security or the potential damage to national security, that resulted from the removal of presidential records from the Trump White House and the storage of those Presidential Records at Mar-a-Lago;
4.  All cross reference files from the CRS that mentions or refers to boxes of Presidential Records removed from the Trump White House that were stored at Mar-a-Lago;
5.  All 302s, FD-204, FD-192, forms mentioning or referring to the National Archives and boxes of Presidential Records removed from the Trump White House that were stored at Mar-a-Lago and classified information;

---

are 'pending or contemplated.  The word 'contemplated[]'. . . speaks to the enforcing agency's *intentions*.  For this, we have substituted 'reasonably anticipated,' a phrase that may be applied . . . to cases in which the agency has the *initiative* in bringing an enforcement action."  (emphasis added) (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 857 (D.C. Cir. 1980))).  The government's decision to move for dismissal of the appeal, and to do so with prejudice, confirms that the government has no "intentions" to pursue any "enforcement action" as to Nauta or Oliveira.  *See id.*

6.  All records, such as emails, letters, memos, text messages reports, mentioning or referring to Presidential Records from the Trump White House that were destroyed and Presidential Records from the Trump White House that were allegedly flushed down the toilet. Please search the same offices listed in part 1 for responsive records.

Defs.' SUMF ¶ 1.  At the time plaintiff filed his request, the government had not formally acknowledged an investigation into President Trump, or anyone else, for mishandling of classified documents.  *Id* ¶ 2.  As such, the FBI issued a *Glomar* response, citing Exemptions 7(A) and 7(E), 5 U.S.C. §§ 522(b)(7)(A), 7(E), neither confirming nor denying the existence of responsive records.  *Id.*  After that response and an administrative appeal affirming the response, plaintiff filed the instant suit.  *See* Compl.

The FBI, appropriately, modified its initial response to the FOIA request when the Attorney General officially acknowledged the Mar-a-Lago search and appointed Special Counsel Smith to oversee the investigation.  Defs.' SUMF ¶ 6.  Following that official announcement, the FBI reopened the FOIA request, *id.*, Joint Status Report at 1, ECF No. 14, and conducted a search for records responsive to the first five categories of the FOIA request across the FBI's CRS, "an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI," Hammer Decl. ¶ 28, and email accounts of named custodians, *id.* ¶¶ 38-48, which, together, "were reasonably calculated to locate all records responsive to Plaintiff's request," *id* ¶ 47.  The search identified responsive documents within and outside the Mar-a-Lago investigative file.  *Id.* ¶¶ 37, 45.[7]  The FBI processed only those responsive records that fell outside the Mar-a-Lago investigative file.

---

[7]    The CRS consists of "a numerical sequence of files, called FBI 'classifications,' which are organized according to designated subjects."  Hammer Decl. ¶ 31.  "The broad array of CRS file classification categories include types of criminal conduct and investigations conducted by the FBI."  *Id.*  "For identification and retrieval purposes . . . when a case file is opened, it is assigned a Universal Case File Number (UCFN) [and] [w]ithin each case file, pertinent documents of interest are 'serialized,' or assigned a number in the order which the document is added to the file, typically in chronological order."  *Id.*  The Mar-a-Lago investigative file is such a case file.  *Id.* ¶¶ 36-37.

Defs.' SUMF ¶¶ 7-12, 20-21.  The FBI then released 499 records in full, 120 in part, and withheld 64 pages in full.  Hammer Decl. ¶ 4.  The FBI, however, maintained that any responsive records in the Mar-a-Lago investigative file were appropriately withheld in their entirety, pursuant to Exemption 7(A).  Defs.' SUMF ¶ 19.  The FBI further asserted that a *Glomar* response as to the sixth category of requested information remained appropriate because "[a]lthough the existence of an FBI investigation about former President Trump's handling of classified records has been publicly acknowledged, the FBI has not disclosed or acknowledged any aspect of the investigation pertaining to this particular matter."  Hammer Decl. ¶ 153.

On June 30, 2024, the defendants filed an unopposed motion to bifurcate review of the documents as to which Exemption 7(A) would be asserted as the basis for withholding, allowing the FBI to withhold those documents in full under that exemption and to reserve for later consideration of any other exemptions that may apply.  Defs.' Mot. to Bifurcate at 1, ECF No. 22.  The FBI noted in its motion that "[a]s for records within the investigative file" "undertak[ing] a full, line-by-line review of documents withheld in full under Exemption 7(A) and to assert other overlapping exemptions would substantially increase the processing time for responsive records in this case."  *Id.* at 2-3.  The FBI anticipated that if the motion for bifurcation were not granted, processing of the documents would take approximately seven months, but if the motion were granted, the processing would take approximately two months.  *Id.* at 2-3.  The defendants' unopposed bifurcation motion was granted.  Min. Order (July 11, 2024).  As already noted, the FBI has now released records responsive to categories one through five in the FOIA request, with some withholdings, in whole or in part.  *See* Hammer Decl. ¶ 4.

Plaintiff raises no challenge to the search conducted to identify responsive records in categories one through five, and exemptions applied to withhold, in whole or part, information in

those records processed by the FBI from outside the agency's Mar-a-Lago investigative file. Pl.'s Opp'n at 5 ("Leopold is not challenging the second set of documents" which "are . . . responsive records outside the [Mar-a-Lago investigative] file").[8]  Two disputes between the parties remain: first, whether the FBI properly asserted a *Glomar* response as to the sixth category of requested information and, second, whether the FBI properly invoked Exemption 7(A) categorically to withhold any responsive documents that fell within its Mar-a-Lago investigative file.  Pl.'s Opp'n at 1-2.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 entitles a party to "summary judgment only if there is no genuine issue of material fact and judgment in the movant's favor is proper as a matter of law." *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (citation omitted); *see also* FED. R. CIV. P. 56(a).  In the context of a FOIA dispute, "courts must grant summary judgment for an agency if its affidavit: (1) describes the justifications for nondisclosure with 'reasonably specific detail'; and (2) is not substantially called into question by contrary record evidence or evidence of agency bad faith."  *Schaerr v. U.S. Dep't of Justice*, 69 F.4th 924, 929 (D.C. Cir. 2023) (quoting *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007)); *see also Aguiar v. Drug Enf't Admin.*, 865 F.3d 730, 734-35 (D.C. Cir. 2017) (explaining that summary judgment may be granted based on agency affidavits "if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith" (citation omitted)).  Most FOIA cases

---

[8]    Although plaintiff originally challenged the adequacy of the FBI's search, *see* Pl.'s Opp'n at 17-18, in reply, this challenge was withdrawn, *see* Pl.'s Reply at 1.

"can be resolved on summary judgment." *Brayton v. Off. of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).

"Congress enacted [FOIA] 'to pierce the veil of administrative secrecy and open agency action to the light of public scrutiny[]' . . . to 'achieve greater transparency in support of open government.'" *Insider Inc. v. Gen. Servs. Admin.*, 92 F.4th 1131, 1133 (D.C. Cir. 2024) (citation omitted) (first quoting *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 31-32 (D.C. Cir. 2018); and then quoting *Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 895 F.3d 770, 783 (D.C. Cir. 2018)).  To find the appropriate balance between the public's interest in governmental transparency and "legitimate governmental and private interests [that] could be harmed by release of certain types of information," *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 913 F.3d 1106, 1108 (D.C. Cir. 2019) (quoting *FBI v. Abramson*, 456 U.S. 615, 621 (1982)), Congress "provided that agencies may only withhold information that falls within one of the Act's nine enumerated exemptions from disclosure," *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 357 (D.C. Cir. 2021), set forth in 5 U.S.C. § 552(b), which "are 'explicitly made exclusive' and must be 'narrowly construed,'" *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011) (citation omitted) (first quoting *EPA v. Mink*, 410 U.S. 73, 79 (1973); and then quoting *Abramson*, 456 U.S. at 630).

FOIA's enforcement mechanism authorizes federal courts to "enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant."  5 U.S.C. § 552(a)(4)(B).  District courts must "determine *de novo* whether non-disclosure was permissible." *Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 777 F.3d 518, 522 (D.C. Cir. 2015).  "FOIA places the burden 'on the agency to sustain its action,' and the agency therefore bears the burden of proving that it has not 'improperly'

11

withheld the requested records." *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Justice*, 922 F.3d 480, 487 (D.C. Cir. 2019) (citation omitted) (first quoting 5 U.S.C. § 552(a)(4)(B); and then quoting *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989)).

"'An agency withholding responsive documents from a FOIA release bears the burden of proving the applicability of claimed exemptions,' typically through affidavit or declaration." *DiBacco v. U.S. Dep't of the Army*, 926 F.3d 827, 834 (D.C. Cir. 2019) (quoting *DiBacco v. U.S. Army* ("*DiBacco I*"), 795 F.3d 178, 195 (D.C. Cir. 2015)). "Summary judgment is warranted based on the agency's affidavit if it 'describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith.'" *Id.* (quoting *DiBacco I*, 795 F.3d at 196). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 715 F.3d 937, 941 (D.C. Cir. 2013) (per curiam) (quoting *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011)).

## III.    DISCUSSION

The FBI's issuance of a *Glomar* response, and related decision not to search for responsive records, as to the sixth category of requested information, and withholding of any responsive documents in its Mar-a-Lago investigative file as to the first five categories of requested information, is based solely on FOIA Exemption 7(A). Defs.' Mem. at 1-3. This exemption permits agencies to withhold documents otherwise responsive to a FOIA request if the "records or information" were "compiled for law enforcement purposes" and "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A).[9]

---

[9]    This exemption states, in relevant part: "(b)This section does not apply to matters that are—… (7) records or information compiled for law enforcement purposes, but only to the extent that the production of such law

Plaintiff argues that the FBI's *Glomar* response is invalid because "the FBI has failed to account for . . . President Trump's possible immunity from prosecution for destroying presidential records and flushing them down the toilet," Pl.'s Opp'n at 7, "prevent[ing] any responsive records from both satisfying the Exemption 7 threshold requirement that any records were 'compiled for law enforcement purposes,' and the separate requirement under Exemption 7(A) that there be a 'reasonably anticipated' enforcement proceeding,'" Pl.'s Reply  at 2. Furthermore, plaintiff argues that the FBI's claims of harm, if required to lift its *Glomar* response, "are too speculative."  Pl.'s Opp'n at 12.  With respect to the investigative file, plaintiff posits that the FBI has failed to carry its burden in demonstrating how "disclosing any responsive and segregable part of the file will harm the ongoing investigation or prosecution."  *Id.*  at 15.

As detailed below, the FBI's *Glomar* response is improper and the categorical withholding of the responsive records contained within the Mar-a-Lago investigative file is insupportable where, as here, no pending law enforcement proceeding exists, or can be reasonably anticipated, and the "Mar-a-Lago investigation," Defs.' Mem. at 11, has been iced, obviating satisfaction of Exemption 7(A)'s requirement that the requested records "could reasonably be expected to interfere with enforcement proceedings," 5 U.S.C. § 552(b)(7)(A). *Accord Leopold v. Dep't of Justice*, 301 F. Supp. 3d 13, 26 (D.D.C. 2018) ("In adopting [Exemption 7(A)], Congress recognized that 'law enforcement agencies have legitimate needs to keep certain records confidential, lest the agencies be hindered in their *investigations* or placed at

---

enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings . . ."  5 U.S.C. § 552(b)(7)(A).

a disadvantage *when it comes time to present their case*.'"  (emphasis added) (brackets omitted)

(quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 224 (1978))).[10]

    **A.**    **The FBI's *Glomar* Response Is Improper Under Current Circumstances.**

    "In certain cases, merely acknowledging the existence of responsive records would itself

'cause harm cognizable under a FOIA exception.'"  *PETA v. Nat'l Insts. of Health* ("*PETA*"),

745 F.3d 535, 540 (D.C. Cir. 2014) (brackets omitted) (quoting *Wolf*, 473 F.3d at 374).  When

that situation arises, "an agency can issue a *Glomar* response, refusing to confirm or deny its

possession of responsive documents."  *Id.*  If an agency asserts a *Glomar* response, it is relieved

of its obligation to search for responsive records.  *See Schaerr v. U.S. Dep't of Justice*, 69 F.4th

924, 928 (D.C. Cir. 2023) ("An agency need not search for records when simply recognizing the

existence or nonexistence of responsive records is protected by a FOIA exemption").  "A

*Glomar* response is valid 'if the fact of the existence or nonexistence of agency records falls

within a FOIA exemption.'"  *PETA*, 745 F.3d at 540 (quoting *Wolf*, 473 F.3d at 374).  "To

determine whether acknowledging the existence or non-existence of responsive records 'fits a

FOIA exemption, courts apply the general exemption review standards established in non-

*Glomar* cases.'"  *Leopold*, 301 F. Supp. 3d at 28 (quoting *Wolf*, 473 F.3d at 374).

---

[10]    Resolution of the pending cross motions for summary judgment on this ground of insufficient showing for application of Exemption 7(A) renders unnecessary further consideration of whether defendants made the appropriate foreseeable harm showing.  Pl.'s Opp'n at 12-14, 16-17; Pl.'s Reply at 8-11; *see generally* Pl.'s Not. Supp. Auth. ("Pl.'s Not."), ECF No. 41.  At the same time, given defendants' misguided position as to what is required under the FOIA Improvement Act, *see* Defs.' Comb. Opp'n Pl.'s XMSJ & Reply Supp. Defs.' MSJ ("Defs.' Reply") at 7-9, ECF No. 38; Defs.' Reply Pl.'s Not, ECF No. 42, they would be well advised to follow the D.C. Circuit's recent direction that "whether a record falls within an exemption and whether nondisclosure of that record is permissible under the Improvement Act's foreseeable harm standard are 'distinct, consecutive inquiries.'" *Hum. Rts. Def. Ctr. v. U.S. Park Police*, --F.4th--, 2025 WL 286516, at *4 (D.C. Cir. Jan. 24, 2025).  As the D.C. Circuit opined, "[i]t should have been 'apparent from the statutory text alone' that the Improvement Act requires a 'particularized inquiry into what sort of foreseeable harm would result from the material's release.'" *Id.* (quoting *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 n.2 (D.C. Cir. 2021)).  The foreseeable harm requirement "is a countermeasure against excessive withholding" because "[i]t compels an agency to release requested materials unless it can 'articulate both the nature of the harm [from release] and the link between the specified harm and specific information contained in the material withheld.'"  *Id.* (quoting *Reps. Comm.* 3 F.4th at 369).

Here, the FBI relies for its *Glomar* response to the sixth category of requested information on Exemption 7(A), which requires an agency to demonstrate that "the requested records were compiled for law enforcement purposes" and that "disclosure [of the records] (1) could reasonably be expected to interfere with (2) enforcement proceedings that are (3) pending or reasonably anticipated." *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Justice* ("*CREW*"), 746 F.3d 1082, 1096 (D.C. Cir. 2014) (quoting *Mapother v. Dep't of Justice*, 3 F.3d 1533, 1540 (D.C. Cir. 1993)). Assuming *arguendo* that any records responsive to the sixth category of requested information were compiled for law enforcement purposes, the FBI has failed to support its *Glomar* response because no pending or reasonably anticipated "investigation [that] continues to gather evidence for a possible future criminal case," *CREW*, 746 F.3d at 1098 (quoting *Juarez v. Dep't of Justice*, 518 F.3d 54, 59 (D.C. Cir. 2008)), has been identified as existing and no enforcement proceeding remains "pending or contemplated," *id*. at 1097. Absent any enforcement proceedings "with which disclosure may interfere," *id.*, Exemption 7(A) does not apply.

Defendants defend invocation of Exemption 7(A) by arguing that a *Glomar* response is required to prevent interference into pending criminal cases arising from execution of the search warrant on Mar-a-Lago and the ensuing investigation. *See* Defs.' Mem. at 3-6, 13-15; Hammer Decl. ¶¶ 154, 161. "Exemption 7(A)," however, "is temporal in nature," and "[t]he proceeding must remain pending at the time of [the court's] decision, not at the time of the initial FOIA request." *CREW*, 746 F.3d at 1097; *see also North v. Walsh*, 881 F.2d 1088, 1100 (D.C. Cir. 1989) ("Disclosure of the information [the requester] seeks cannot interfere with parts of the enforcement proceeding already concluded."). As outlined above, *supra* Part I.B., during the pendency of this case, the DOJ dismissed all federal charges against President Trump and has

moved to dismiss the appeal, with prejudice, challenging the district court's dismissal of the indictment as to his co-defendants.  As such, the DOJ's intervening actions have mooted the only pending or contemplated enforcement proceedings the FBI has identified, Defs.' Mem. at 6, that could potentially be harmed by confirming or denying the existence of records described in category six.  Contrary to the FBI's fear that acknowledging the existence, or lack thereof, of records responsive to category six would "reasonably be expected to hamper prosecutorial efforts by exposing potential witness or sources to harassment, intimidation, coercion, physical threats or actual harm," Hammer Decl. ¶ 154, no "prosecutorial efforts" that may be "hamper[ed]" by lifting the *Glomar* response remain pending or contemplated.

Moreover, defendants fail to demonstrate that future enforcement proceedings are "*reasonably anticipated*."  *Mapother*, 3 F.3d at 1540 (emphasis in original).  As plaintiff pointedly highlights, as to President Trump, "there is a reasonable argument that [he] is immune from prosecution for flushing his own records down the toilet while in office."  Pl.'s Reply at 2; *see* Pl.'s Opp'n at 7 (citing *Trump v. United States*, 603 U.S. 593 (2024)).  Defendants try to duck consideration of the repercussions of this radical shift in the legal landscape made by the Supreme Court's grant to the president of absolute and presumptive immunity from criminal liability for conduct while in office, saying that President Trump's potential immunity from prosecution need not be considered due to the "heavy burden on agencies" to "consider the merits of various defenses, like immunity, that the target of an investigation might assert in an eventual criminal trial."  Defs.' Reply at 5.  Defendants lament that a burden to evaluate President Trump's immunity defense "is not justified by existing authority," *id.* at 5, but without citing to any "existing authority."  Plaintiff counters that defendants "bear[] the burden to show a reasonably anticipated enforcement proceeding," Pl.'s Reply at 4, and that defendants "cite[] no

16

case that an agency need not meet its ordinary burden because it would take some effort," *id.* at

3.

Both parties acknowledge, *see* Defs.' Mem. at 8-9, Pl.'s Opp'n at 5, that defendants

"bear[] the burden of justifying any withholding," *Citizens for Resp. & Ethics in Wash. v. U.S*

*Dep't of Justice*, No. 20-cv-0212 (EGJ), 2022 WL 4598537, at *3 (D.D.C. Sept. 30, 2022).

Neither party, however, cites any precedent for their respective positions regarding the extent to

which the burden on the agency invoking Exemption 7(A) encompasses the evaluation of

potential immunity defenses, *see* Defs.' Reply at 5, Pl.'s Reply at 3-5, presumably because of the

novelty of this issue in the wake of the Supreme Court's new grant of immunity to the President.

To be sure, other FOIA exemptions, like Exemption 5, 5 U.S.C. § 552(b)(5), may relieve federal

agencies of any obligation to weigh the merits of "case-specific exceptions," *Stonehill v. IRS*,

558 F.3d 534, 539 (D.C. Cir. 2009), regarding the legal or factual underpinnings giving rise to

the agency's invocation of the exemption.  *See, e.g.*, *Wright v. Admin. for Children & Families*,

No. 15-cv-218 (BAH), 2016 WL 5922293, at *11 (D.D.C. Oct. 11, 2016) ("Exemption 5's

protection of privileged materials is not subject to the same exceptions to which the common law

privilege is susceptible."); *Williams & Connolly v. SEC*, 662 F.3d 1240, 1244 (D.C. Cir. 2011)

(noting that under FOIA, a party's "notes not turned over in [a] criminal trial still remain . . .

work product material not ordinarily discoverable in civil proceedings" and FOIA, thus,

protected documents, even though "[i]n criminal trials, evidentiary privileges may give way for

any number of reasons").  In contrast to the litigation privileges, which operate to restrict the use

of certain evidence in legal proceedings and may be invoked by federal agencies for withholding

from disclosure under Exemption 5, absolute or qualified immunity is an entitlement to

"*immunity from suit* rather than a mere defense to liability."  *Mitchell v. Forsyth*, 472 U.S. 511,

526 (1985) (emphasis in original).  Put another way, the grant of immunity operates to bar the possibility of a legal proceeding and, concomitantly, eliminates the possibility of satisfying the requirements for invocation of Exemption 7(A).

Exemption 7(A) is forward looking and explicitly requires an agency to consider whether records compiled for law enforcement purposes "could reasonably be expected to interfere with enforcement proceedings," 5 U.S.C. § 552(b)(7)(A), because such proceedings, if not pending, are "reasonably anticipated."  *Mapother*, 3 F.3d at 1540 (emphasis omitted).  Here, whether a law enforcement action against President Trump may be reasonably anticipated is a necessary showing for defendants to invoke Exemption 7(A), *see id.*[11]  As such, defendants have not shouldered their burden by submitting supporting declarations that ignore whether reviving a criminal enforcement proceeding against President Trump is even possible.

The possibility of any federal law enforcement proceeding against President Trump measurably shrank even before briefing in this case began, when the Supreme Court, in *Trump v. United States*, 603 U.S. 593 (2024), held that a president is "at least presumptive[ly] immune[] from criminal prosecution for . . . acts within the outer perimeter of his official responsibility," *id.* at 595 (emphasis omitted), "without regard to motive or intent, . . . and [is] quite possibly 'absolute[ly]'" immune, *id.* at 660 (Sotomayor, J., dissenting).  As such, "Presidents therefore

---

[11]    Defendants seemingly argue that Exemption 7(A) extends to criminal investigations independent of whether they are tied to enforcement proceedings that are reasonably anticipated. Defs.' Reply at 3 n.1 ("[T]he universe of 'enforcement proceedings' that Exemption 7(A) protects includes not only prosecutions, but criminal investigations in advance of those prosecutions.").  To the extent that defendants argue that, standing alone, "[a] pending criminal investigation constitutes an 'enforcement proceeding,'" *id.* (quoting *Barrett v. U.S. Dep't of Justice*, No. 09-2959, 2010 WL 4256466, at *3 (E.D. Cal. Oct. 21, 2010)), that is an incorrect statement of law.  The D.C. Circuit has made clear that Exemption 7(A) may cloak investigative files, but only those that are prepared during an investigation that "is likely to lead to" an "enforcement proceeding."  *Ctr. for Nat. Sec. Studs. v. U.S. Dep't of Justice*, 331 F.3d 918, 926 (D.C. Cir. 2003).  As such, Exemption 7(A) does not extend to an investigation that will not result in a reasonably anticipated enforcement proceeding.  *See CREW*, 746 F.3d at 1096 ("To be sure, an ongoing criminal investigation typically triggers Exemption 7(A): '[S]o long as the investigation continues to gather evidence for a possible future criminal case*, and that case would be jeopardized by the premature release of that evidence, Exemption 7(A) applies.'"  (emphasis added) (quoting *Juarez v. Dep't of Justice*, 518 F.3d 54, 59 (D.C. Cir. 2008))).

cannot be indicted based on conduct for which they are immune from prosecution." *Id.* at 630

(majority opinion). In coming to this conclusion, which three dissenting Justices described as

"mak[ing] a mockery of the principle, foundational to our Constitution and system of

Government, that no man is above the law," *id.* at 657 (Sotomayor, J., dissenting), the Court also

created an evidentiary privilege, requiring that "acts for which the President is immune must be

redacted from the narrative of even wholly private crimes committed while in office," *id.* at 681.

*See also id.* at 655 (Barrett, J., concurring in part and dissenting in part) (dissenting from the

majority's finding of an evidentiary privilege because "[t]he Constitution does not require

blinding juries to the circumstances surrounding conduct for which Presidents *can* be held

liable"). Regardless of the soundness of the majority's decision, *see id.* at 683 (Sotomayor, J.,

dissenting) ("Today's decision to grant former Presidents immunity for their official acts is

deeply wrong."), plaintiff has offered a variety of reasons why President Trump is presumptively

or absolutely immune from criminal prosecution for actions he took related to the alleged

mishandling of classified documents while he was President, *see* Pl.'s Opp'n at 7-9, Pl.'s Reply

at 1-5. Defendants, though, have failed to address how President Trump's presumptive

immunity from criminal prosecution and likely immunity from suit can be squared with

Exemption 7(A)'s requirement that "an agency [can] withhold law enforcement records and

information only if the release of such information 'relates to a concrete prospective law

enforcement proceeding," *Leopold v. U.S. Dep't of Justice*, No. 17-cv-2819 (APM), 2022 WL

4598596, at *9 (D.D.C. Sept. 30, 2022) (emphasis omitted) (quoting *Carson v. U.S. Dep't of

Justice*, 631 F.2d 1008, 1018 (D.C. Cir. 1980)). With the far dampened possibility of any

criminal investigation to gather evidence about a president's conduct and of any public

enforcement proceeding against a president, the majority's decision in *Trump*, 603 U.S. 593, has

left a FOIA request as a critical tool for the American public to keep apprised of a president's conduct, accomplishing FOIA's goal to allow the citizenry to "know what its government is up to," *Hum. Rts. Def. Ctr. v. U.S. Park Police*, --F.4th--, 2025 WL 286516, at *1 (D.C. Cir. Jan. 24, 2025) (quoting *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 171 (2004)).  Somewhat ironically, the constitutional and procedural safeguards attached to the criminal process include significant confidentiality mechanisms, *see, e.g.* FED. R. CRIM. P. 6(e) (regarding grand jury secrecy), with a parallel safeguard in Exemption 7(A) to help preserve the necessary confidentiality of ongoing criminal investigations leading to anticipated enforcement actions, but for an immune president, Exemption 7(A) may simply be unavailable, as it is here.

To take an example used in both the D.C. Circuit and the Supreme Court, if the president "[o]rders the Navy's Seal Team 6 to assassinate a political rival," the president may now be "immune" from criminal prosecution for ordering the hit.  *Trump v. United States*, 603 U.S. 593, 685 (Sotomayor, J., dissenting); *see also* Oral Argument at 8:21, *Trump v. United States*, 91 F.4th 1174 (2024) (No. 23-3228), https://media.cadc.uscourts.gov/recordings/docs/2024/01/23-3228.mp3.  While this conclusion may permit "an energetic . . . Executive," *id.* at 642 (majority opinion), "from answering for criminal and treasonous acts," *id.* at 657 (Sotomayor, J., dissenting), a FOIA request may "pierce the veil of administrative secrecy," *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991), to give the American people access to facts reflected in disclosed records regarding the president's conduct, even if the president may now be legally immune from criminal prosecution.  *See Robbins Tire*, 437 U.S. at 242 ("The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed.").[12]

---

[12]     Of course, while the Supreme Court has provided a protective and presumptive immunity cloak for a president's conduct, that cloak is not so large to extend to those who aid, abet and execute criminal acts on

Additionally, the FBI has failed to support its *Glomar* response with respect to any

alleged criminal conduct that occurred *after* President Trump lost the 2020 presidential election.

The FOIA request seeks "Presidential Records from the Trump White House that were destroyed

and Presidential Records from the Trump White House that were allegedly flushed down the

toilet," Hammer Decl. ¶ 6, without limitation with respect to *when* such conduct occurred, *i.e.*,

whether President Trump or anyone else allegedly flushed presidential records down the toilet or

otherwise destroyed presidential records while President Trump was in office during his first

term or after he lost the 2020 presidential election.  While the FBI's proffered reasons for its

*Glomar* response for any alleged criminal conduct that occurred during President Trump's first

term are unpersuasive given the agency's failure to consider whether or not such a law

enforcement proceeding is reasonably anticipated, or even possible, due to presidential criminal

liability immunity, as discussed above, the agency also cannot point to a reasonably anticipated

enforcement proceeding for any conduct that occurred after President Trump lost the 2020

presidential election and left the White House.  As a result of the election held on November 5,

2024, President Trump was inaugurated as President of the United States on January 20, 2025,

*see* Gov't's Mot. to Dismiss ("Gov't's MTD"), *United States v. Trump*, No. 23-cr-257 (D.D.C.

---

behalf of a criminally immune president.  The excuse offered after World War II by enablers of the fascist Nazi regime of "just following orders" has long been rejected in this country's jurisprudence.  *See, e.g., United States v. North,* 910 F.2d 843, 926 (D.C. Cir. 1990) (rejecting suggested instruction in criminal case that "goes so far as to conjure up the notion of a 'Nuremberg' defense, a notion from which our criminal justice system, one based on individual accountability and responsibility, has historically recoiled. …[W]e refuse to hold that following orders, without more, can transform an illegal act into a legal one."), *withdrawn and superseded in part on other grounds by United States v. North,* 920 F.2d 940 (D.C. Cir. 1990); *North,* 910 F.2d at 881 (Wald, C.J., concurring in part and dissenting in part) ("[O]ur criminal law does not recognize a 'following orders' or 'Nuremberg' defense."); *see also O'Rourke v. Hayes,* 378 F.3d 1201, 1210 n.5 (11th Cir. 2004) ("[S]ince World War II, the 'just following orders' defense has not occupied a respected position in our jurisprudence, and officers in such cases may be held liable under § 1983 if there is a 'reason why any of them should question the validity of that order.'"  (quoting *Brent v. Ashley,* 247 F.3d 1294, 1306 (11th Cir. 2001))); *United States v. Funmaker,* 10 F.3d 1327, 1331 (7th Cir. 1993) ("It must be clear that defendants cannot circumvent federal prosecution by claiming that they were merely following orders . . . . [T]he government is entitled to prosecute individuals who follow orders to violate federal law, [and] the fact that [defendant] was following the orders of tribal authorities does not immunize him from federal prosecution.").

Nov. 25, 2024), ECF No. 281, and "[i]t has long been the position of the Department of Justice that the United States Constitution forbids the federal indictment and subsequent criminal prosecution of a sitting President," *id.* at 1. *See generally* Memo. from Randolph D. Moss, Asst. Att'y Gen., Off. of Legal Counsel, *A sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222 (Oct. 16, 2000) ("2000 OLC Op."). Consequently, President Trump enjoys "temporary" immunity from criminal prosecution until the end of his presidential term in January of 2029, *see* Gov't's MTD at 5, 6, 2000 OLC Op. at 257, and the statute of limitations of the charges against him or those plausibly applicable to his alleged conduct that were the subject of Special Counsel Smith's investigation will have expired, *see* Pl.'s Opp'n at 12 (citing 18 U.S.C. § 3282 which provides for a five-year limitations period for non-capital offenses). *See, e.g.*, *Leopold v. U.S. Dep't of Justice*, No. 17-cv-2819 (APM), 2022 WL 4598596, at *9 (D.D.C. Sept. 30, 2022) (holding that "there can be no 'prospective' law enforcement proceeding" for purposes of Exemption 7(A) if "any prosecution . . . would be time barred"). Like its failure to grapple with whether President Trump's absolute or presumed immunity from criminal liability forecloses a reasonably anticipated enforcement proceeding, the FBI has similarly neglected weighing the extent to which President Trump's current role precludes a reasonably anticipated enforcement proceeding. As such, the FBI's *Glomar* response fails regardless of whether the alleged conduct at issue occurred during or in the months after President Trump's first term.

Finally, recent events have thoroughly removed any residual basis for the argument that confirming or denying the existence of records responsive to category six could interfere with law enforcement proceedings against persons other than the president or in an ongoing investigation. As already noted, the government has dismissed all federal felony charges against

President Trump and has moved to dismiss the appeal, with prejudice, challenging the district

court's dismissal of the indictment as to his co-defendants that stemmed from the investigation at

Mar-a-Lago.  Special Counsel Smith's investigation, the only investigation relied upon in

defendants' affidavits, *see* Hammer Decl. ¶¶ 27, 37, 83-85, 89, 98-100, 104, 107, 130-131, 135,

137, 153-154, 160, has concluded, *see* Special Counsel Smith's Ltr. at 4.  The federal

prosecutors assisting Special Counsel Smith in his investigation and in bringing the now-

dismissed criminal actions have been fired.  *See* Bruce Green & Rebecca Roiphe, *Firing of Jack

Smith's Team is a Threat to Rule of Law*, Law360 (Jan. 31, 2025, 2:38 PM),

https://perma.cc/KC84-SUKB (reporting on the firing and quoting from the emailed memo that

was sent to those who had been fired).[13]  Thus, defendants' averments for invoking Exemption

7(A) that law enforcement proceedings are pending or reasonably likely, Hammer Decl. ¶ 154,

Defs.' Reply at 3, are no longer "logical or plausible." *Judicial Watch*, 715 F.3d at 941 (citation

and internal quotation marks omitted).  *See also Mapother*, 3 F.3d at 1540 ("[Exemption 7(A)] is

available where enforcement proceedings are 'pending or contemplated. The word

'contemplated[]'. . . speaks to the enforcing agency's *intentions*."  (emphasis added)).

   The same is true regarding defendants' argument that "[i]f the FBI disclosed the

existence or nonexistence of records responsive to Item No. 6 of Plaintiff's request at this stage

of the FBI's investigation, such a disclosure could reasonably be expected to hamper and

interfere with the pending investigation."  Hammer Decl. ¶ 161.  This is not a situation where the

---

[13]     Judicial notice may be taken of "fact[s] in the absence of formal proof," *see Weinstein v. Republic of Iran*, 175 F. Supp. 2d 13, 16 (D.D.C. 2001) (quoting *United States v. Neill*, 964 F. Supp. 438, 446 (D.D.C. 1997)). To do so, the facts need only be "outside the area of reasonable controversy."  Fed. R. Evid. 201, advisory comm. note.  The widely reported firings of Special Counsel Smith's prosecution team by acting Attorney General James McHenry are such facts. *See, e.g., ACLU v. CIA*, 710 F.3d 422, n.10 (D.C. Cir. 2013) (taking judicial notice of statements made by the president and government officials that occurred after the district court issued its opinion but prior disposition of the case on appeal); *Gosen v. U.S. Citizenship & Immig. Servs.*, 75 F. Supp. 3d 279, 293 (D.D.C. 2014) (taking judicial notice of facts in disposing of motions for summary judgment in a FOIA case).

FBI has refused to confirm or deny whether an investigation exists at all.  *See Leopold v. Dep't of Justice*, 301 F. Supp. 3d 13, 28-29 (D.D.C. 2018) (upholding *Glomar* response regarding a FOIA request for records of an investigation, the existence of which was neither confirmed nor denied).  Instead, the FBI has confirmed the existence of an investigation but refuses to confirm or deny a "facet of the investigation," Defs.' Mem. at 1, because "in consultation with Special Counsel's Smith's office, [the FBI] determined that merely acknowledging the existence or non-existence of records responsive to Item No. 6 of plaintiff's request reasonably could be expected to interfere with [the Special Counsel's] ongoing investigation."  Hammer Decl. ¶ 154.  Simply put, that investigation, which is the sole investigation defendants rely on to support their use of a *Glomar* response, is no longer pending but in fact closed and the investigating officials fired under the new Trump Administration.  In these circumstances, defendants' *Glomar* arguments crumble with no more weight than dust and just as little persuasiveness.

***

"The *Glomar* doctrine is in large measure a judicial construct, an interpretation of FOIA exemptions that flows from their purpose rather than their express language."  *ACLU v. CIA*, 710 F.3d 422, 431 (D.C. Cir. 2013).  "In this case, [defendants] asked the court to stretch that doctrine too far—to give [the court's] imprimatur to a fiction of deniability that no reasonable person would regard as plausible."  *Id.*  "'There comes a point where . . . Court[s] should not be ignorant as judges of what [they] know as men' and women."  *Id.* (quoting *Watts v. Indiana*, 338 U.S. 49, 52 (1949)).  Given recent events, this point has been reached as to whether the FBI needs to confirm or deny whether or not documents exist that "mention[] or refer[] to Presidential Records from the Trump White House that were destroyed and Presidential Records from the Trump White House that were allegedly flushed down the toilet."  Defs.' SUMF ¶ 1.

No law enforcement investigation is pending nor is any such criminal enforcement proceeding reasonably likely anymore.  Therefore, plaintiff's cross-motion for summary judgment demanding that the FBI lift its *Glomar* response to the sixth category of records requested in the FOIA request and search for responsive records to the extent they exist is granted, and defendants' motion for summary judgment on this legal issue is denied.

### B.    FBI's Categorical Withholding of Responsive Records in the Mar-a-Lago Investigative File Under Exemption 7(A) Fails.

The FBI has invoked Exemption 7(A) to withhold *in toto* documents that are contained within the agency's Mar-a-Lago investigative file.  Defs.' Mem. at 1-2; Hammer Decl. ¶ 164. Defendants' arguments in support of putting this investigative file off-limits from the FOIA request largely mirror those that asserted to maintain the FBI's *Glomar* response.  *See* Defs.' Mem. at 15-21.  For example, defendants argue that, although the investigation has been acknowledged, this fact does "not undermine the extremely sensitive nature of the ongoing Mar-a-Lago investigation, and the critical need to protect any further details regarding its targets, its scope, the work that has been done to date, and the work that remains to be done."  Defs.' Mem. at 15.  Yet, as noted, that investigation is no longer active nor even pending since the investigation is closed—critical circumstances substantially undermining reliance on Exemption 7(A).  *See* Special Counsel Smith's Ltr. at 4.  Indeed, the dedicated public servants who worked on and have the deepest knowledge of the facts underlying this investigation, including career federal prosecutors in Special Counsel Smith's Office, have been summarily fired by the new Trump Administration.

"[R]eliance on Exemption 7(A) may become outdated when the proceeding at issue comes to a close."  *CREW*, 746 F.3d at 1097.  This has happened here.  The same intervening events that make obsolete the FBI's *Glomar* response, *see supra* Part III.A., also prevent the FBI

from categorically withholding, under Exemption 7(A), responsive documents contained within an investigative file.

Defendants' motion for summary judgment seeking judgment in their favor as to the legality of relying on Exemption 7(A) to withhold entirely the FBI's investigative files from the processing of the FOIA request at issue and to assert a *Glomar* response to the sixth category of requested information, must be denied, and plaintiff's cross motion for summary judgment as to these legal issues is granted. The parties are directed to submit jointly, by February 20, 2025, a status report proposing a schedule to govern future proceedings to conclude this case expeditiously.[14]

## IV.    CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is denied, and plaintiff's cross-motion for summary judgment is granted.

An order consistent with the holdings in this Memorandum Opinion will be entered contemporaneously.

Date:  February 10, 2025

_____
**BERYL A. HOWELL**
United States District Judge

---

[14]     After the Supreme Court decided *Trump v. United States*, 603 U.S. 593 (2024), plaintiff offered to narrow his request to seek documents only as to President Trump, Pl.'s Opp'n, Leopold Decl. ("Leopold Decl.") ¶ 9, ECF No. 34-4, but, without any noted reasons in the record, the FBI refused this offer, *see* Defs.' Mem., Defs.' Reply; Leopold Decl. ¶ 10.  Given the "over 1.28 million pages of unclassified discovery and all of the CCTV footage obtained" in the Special Counsel's investigation, Pl.'s Opp'n at 16 (quoting Gov't's Response Opp'n Defs.' Mot. Compel Discovery at 1, *United States v. Trump*, No. 23-cr-80101 (S.D. Fla. Apr. 22, 2024), ECF No. 470), defendants would be well advised to confer with plaintiff to narrow his request moving forward.